740 F.2d 792
 21 ERC 1759, 14 Envtl. L. Rep. 20,687
 MOUNTAIN STATES LEGAL FOUNDATION, a nonprofit corporation,
on behalf of its members who use and enjoy the public lands
in the Rock Springs, Wyoming area, and the Rock Springs
Grazing Association, which owns and leases lands in the Rock
Springs, Wyoming area, Plaintiffs-Appellants,
v.
William CLARK, as Secretary of the Department of the
Interior, James W. Byrd, as United States Marshal of the
District of Wyoming, Frank Gregg, individually, former
Director of the Bureau of Land Management, and the United
States of America, Defendants-Appellees.
 No. 82-1485.
 United States Court of Appeals,
Tenth Circuit.
 July 23, 1984.
 
 McKay, Circuit Judge, filed an opinion concurring in part and dissenting in part.
 Constance E. Brooks, Mountain States Legal Foundation, Denver, Colo. (Roger J. Marzulla, William H. Mellor III and R. Norman Cramer, Jr., Mountain States Legal Foundation, Denver, Colo., and Calvin Ragsdale of Marty & Ragsdale, Green River, Wyo., on the brief), for plaintiffs-appellants.
 Dianne H. Kelly, Atty., Wildlife and Marine Resources, Land and Natural Resources Div., Dept. of Justice, Washington, D.C. (Carol E. Dinkins, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., Richard Stacy, U.S. Atty., Cheyenne, Wyo., Robert L. Klarquist and James P. Leape, Attys., Dept. of Justice, Washington, D.C., on the brief), for defendants-appellees.
 Before SETH, Chief Judge, and HOLLOWAY and McKAY, Circuit Judges.
 SETH, Chief Judge.
 
 
 1
 The complaint of plaintiffs, who are owners of grazing lands, brought this action against the Secretary of Interior and the United States for the unconstitutional taking, without condemnation proceedings, of forage on their private lands. This taking, it is alleged, resulted from the failure by the defendants to manage herds of wild horses contrary and in violation of the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. Sec. 1331 et seq. Mandamus is sought to require defendants to remove the horses from plaintiffs' lands. Also substantial damages were sought against the Secretary of Interior and other officials for willfully preventing the proper management of the horses under the Act to the damage of plaintiffs.
 
 
 2
 This case concerns grazing in the southwestern part of Wyoming known as the checkerboard. These lands are so described because alternate sections are private lands and public lands administered by the Bureau of Land Management under the Taylor Grazing Act. The ownership is thus checkerboarded. In the area in question, which is about 115 miles long and 40 miles wide, the Rock Springs Grazing Association composed of a group of ranchers owns or leases the private lands. The area, of course, generally follows the railroad. The land is described as high desert, the forage is very limited, the area is sensitive to overuse, and there are few if any fences to mark property lines. The Grazing Association has been in business since 1909 and has used the area with seasonal variations during that time. The depositions indicate that with the limited forage and the need to use different portions of the area during different seasons a large acreage is required to support a horse or cow.
 
 
 3
 The affidavits show that horses have used the range since ranchers have been in the area. The horses were originally from ranchers' herds as all were not gathered, but were left on the range to be available as a source of ranch horses and horses for sale for military and general use. The record shows that studs of good varieties were introduced by the ranchers to improve the herds. The depositions describe the different strains or breeds of horses which so resulted and which can be now recognized.
 
 
 4
 There apparently has been no attempt in recent years, and certainly not since 1971, by the ranchers to manage the herds of horses. It appears that a large percentage of the horses in the area are unclaimed. Since the Government has assumed control of the horses their numbers have increased greatly. The horses compete for forage with wild animals and with livestock on the entire range.
 
 
 5
 The complaint alleges that the Secretary has mismanaged the public lands in the Rock Springs District in that he has not managed the horses in accordance with the Wild Horse Act thereby causing a deterioration of the range. The Government admits the horses have been using plaintiffs' lands.
 
 
 6
 The complaint states that requests have been made that the horses be removed from plaintiffs' lands. This the Government also admits. The complaint as to the number of horses, states:
 
 
 7
 "Plaintiff Rock Springs Grazing Association is desirous of maintaining and preserving a reasonable number of wild horses in the checkerboard area pursuant to previous understandings with the defendants and other interested parties. The Association has expressed to defendants on numerous occasions its willingness to accomplish the purposes of the Wild Horse Act and allow a reasonable and manageable number of wild horses to remain on Association land."
 
 
 8
 The plaintiffs allege that the control and management of the horses is exclusively in the Government (and the Secretary agrees); that this control is complete; that the Government by the express provisions of the Act must remove horses from private lands when requested; that many such requests have been made by plaintiffs but the horses continued to consume the forage on plaintiffs' lands and thereby a taking of their property resulted. The plaintiffs sought a writ of mandamus to have the horses removed from their property, prayed for nominal damages for the consumption of forage, and for substantial damages against the Secretary for failure to administer the Wild Horse Act and thereby causing damage to plaintiffs.
 
 
 9
 The trial court issued the writ of mandamus and ordered all wild horses removed from the Association's land within one year and a reduction in the wild horse population on the public lands within two years. The trial court eventually dismissed the claim against the BLM director and granted the Government's cross-motion for summary judgment on the unconstitutional taking claim. The plaintiffs relinquished their claim for attorneys' fees and costs. The plaintiffs appeal the dismissal of their claim against the BLM director and the court's order denying nominal damages against the Government.
 
 
 10
 The horses generally, and especially those with identifiable characteristics of particular breeds, cannot be classified as "wild animals" in an attempt to compare them or the Act to other statutes relating to wild birds and wild animals. The horses do not have to be "wild animals" to come within the Act, but other requirements must be met. In the checkerboard area, the parties have assumed that the horses in question come within the definition in the Wild Horse Act.
 
 
 11
 Since the Government has assumed jurisdiction over the horses under the Act it has thereby taken the exclusive and complete control of the horses and also the duty to manage them. As to control, the Act and Regulations permit no one else to move the horses no matter where they are. No one else can manage the horses. Landowners cannot move them from their land. If the horses stray from public lands onto private lands the owners must request the Government to remove the horses if they want them off their land.
 
 
 12
 It is this complete and exclusive control which makes the Act unique. It cannot be compared, as we have stated, with statutes which relate to wild animals or birds. The drafters of the Act so made the control exclusive in the Government and complete with both the affirmative and negative provisions (with criminal penalties). The implications of the complete and sole control must be examined and applied to the legal relationship of the parties. This degree of control can become the significant factor in an examination of the liability of the Government.
 
 
 13
 The control feature is reinforced by an affirmative express management duty on Interior. The Act thus presumes (and the agency apparently acknowledges) that the management responsibility can and must be carried out. This is the physical management of the horses as to range use, water, location at seasons, and numbers. Thus it is mandated that the horses can be moved to places they should use for good range management and that their numbers be kept within proper limits.
 
 
 14
 The Act further presumes that Interior can and will control and manage the horses by including an explicit duty on Interior to remove the horses from private land when requested to do so. The agency has assumed this duty and an ability to so act.
 
 
 15
 The plaintiffs allege that the Secretary has not managed the horse herds as required in the Act, has not controlled them or their numbers, see American Horse Protection Ass'n v. Andrus, 460 F.Supp. 880 (D.Nev.1978), and also it has not removed horses from their private lands when requested to do so. See Roaring Springs Associates v. Andrus, 471 F.Supp. 522 (D.Nev.1978). Requests to remove the horses it is alleged were made by the plaintiffs at the many meetings with the BLM, and later formal written requests were made all of which the Secretary acknowledges. Requests were also made to reduce the number of horses on the checkerboard to reduce damage to the range. All concerned acknowledged the increase in numbers was causing problems. The Secretary in his Answer herein said:
 
 
 16
 "Admit that an increase in wild horse population has resulted in an over-population and an excessive demand on the public range."
 
 
 17
 The requests to remove the horses were not met despite the statutory duty of Interior. This inaction knowingly permitted the horses to consume forage on plaintiffs' private land according to the pleadings and affidavits. This is alleged by plaintiffs as a taking of their forage crop--a taking of their private personal property. Substantial damages resulting from the taking of the forage is described but only nominal damages are prayed for.
 
 
 18
 The cause of action, and the allegations relating to failure to manage the horses on a sound ecological basis under Congressional policy statements, was never put in issue. The Government seems to have taken no position because it answered that it was without knowledge or information on the matter. The trial court did not include these causes of action and issues in his determination of the case.
 
 
 19
 It is only by reason of the checkerboarded ownership of the lands that horse control and management could become a factor or issue on the taking of plaintiffs' property. The BLM horse management practices for the District, insofar as it covers the checkerboard, is and was as applicable to private lands as it was to public lands. The Act was so drafted that the BLM was the only one who could in any way manage or control the impact of the increased number of horses using everybody's land. The affidavits describe the range damage caused by the increase in the number of horses and their seasonal management. This overuse was asserted to include consumption of the forage crops of plaintiffs and thereby it was alleged that a taking of private property had taken place.
 
 
 20
 The taking allegations are also based on the refusal of the BLM to remove the horses from plaintiffs' land. This may or may not be distinct from asserted failure to manage under the Act.
 
 
 21
 The allegations as to a taking do not refer or rely on a single event or occurrence but to a continued course of action during the year for a period of years. Personal property is within the constitutional protection as to "taking". United States v. 12.18 Acres of Land in Jefferson County, Kansas, 623 F.2d 131 (10th Cir.1980); King v. United States, 427 F.2d 767 (Ct.Cl.1970). See also Pennsylvania Hospital v. Philadelphia, 245 U.S. 20, 38 S.Ct. 35, 62 L.Ed. 124 (1917).
 
 
 22
 The issuance of the writ of mandamus did not become an issue on this appeal and no position is taken as to it.
 
 
 23
 The denial of damages against the Secretary is affirmed. The judgment of the trial court is reversed as to the issue of the taking of forage for a factual determination whether such forage was taken by the continued failure to manage the horses and by permitting their continued use of private lands by the increased number of horses and burros since 1971.
 
 
 24
 IT IS SO ORDERED.
 
 
 25
 McKAY, Circuit Judge, concurring in part and dissenting in part:
 
 
 26
 However innocuous it may at first appear, the court's opinion represents a radical departure from established constitutional precedent with sweeping implications for the enforcement of all environmental regulatory statutes.
 
 
 27
 The Wild Free-Roaming Horses and Burros Act, 16 U.S.C. Secs. 1331-1340, was enacted by Congress in 1971. 16 U.S.C. Secs. 1331-1340 (1982) (the Act). The primary purpose of its enactment was the protection of animals declared by Congress to be "living symbols of the historic and pioneer spirit of the West" and which animals "contribute to the diversity of life forms within the nation and enrich the lives of the American people." 16 U.S.C. Sec. 1331. See also S.Rep. No. 242, 92d Cong., 1st Sess., reprinted in 1971 U.S.Code Cong. & Ad.News 2149-50. According to congressional findings, these animals had been cruelly slain, used for target practice and harassed for sport and profit. Id. The Act sets out: congressional findings, 16 U.S.C. Sec. 1331; definitions, id. Sec. 1332; the powers and duties of the Secretary of the Interior to whom jurisdiction of the wild horses and burros has been entrusted, id. Sec. 1333; a scheme for private maintenance, id. Sec. 1334; and criminal provisions, id. Sec. 1338.
 
 
 28
 In structure and purpose, the Wild Free-Roaming Horses and Burros Act is essentially identical to the Protection of Bald and Golden Eagles Act. 16 U.S.C. Secs. 668-668(d) (1982). The Bald and Golden Eagles Act prohibits possession, commerce, killing or other activities with reference to the bald and golden eagle, whether dead or alive, their eggs and nests, with both criminal and civil penalties for violation. The Act is absolute in its terms except that there is a provision for obtaining a permit from the Secretary of Interior to destroy or remove eagles that are destroying lifestock or agricultural crops. Id. Sec. 668(a). This ameliorative provision is essentially identical to the ameliorative provision of the Wild Free-Roaming Horses and Burros Act. 16 U.S.C. Sec. 1334 (1982). Under some circumstances, even the Secretary may not issue a permit for the taking of eagles even if they do damage to animals and crops. See 50 C.F.R. Sec. 22.23(c) (1983).
 
 
 29
 There are numerous other similar statutes and regulations particularly relating to endangered species, 16 U.S.C. Secs. 1531-1543 (1982), some of which notoriously do damage to domesticated livestock and agricultural crops. The list of endangered species includes the Grizzly Bear, San Joaquin Fox, Jaguarundi, Ocelot, Florida Panther, Utah Prairie Dog, Red Wolf, and Grey Wolf. 50 C.F.R. Sec. 17.11 (1983). In these endangered species statutes, there is no provision, with the exception of the Grizzly Bear, to remove or destroy the endangered animals if they do damage to livestock. See 16 U.S.C. Sec. 1539 (1982); 50 C.F.R. Secs. 17.1 to 17.40.
 
 
 30
 It is important to set forth the detailed parallels in other government statutes and regulations in order to understand what is at stake in this case. Notwithstanding the court's implied suggestion to the contrary, the horses and burros regulated under this Act are legally wild in the same sense that any other "wild" animal is wild. The Act declares them to be so. 16 U.S.C. Sec. 1332(b); see also 1971 U.S.Code Cong. & Ad.News at 2149, 2153.
 
 
 31
 It is conceded that the basic stock of wild horses and burros were on the checkerboard lands before the ranchers in this action obtained these lands. The fact that they were once domesticated and that the herds have been supplemented by other animals which were once domesticated is totally irrelevant. There is no authority whatever for suggesting that Congress cannot declare free roaming, unclaimed animals to be "wild." The beginning point for an analysis of the issues in this case is the fact that the Act is a scheme designed to regulate wild animals just as all the other acts regulate animals, birds, and insects not owned by someone. Thus, to sustain this attack on the Wild Horses and Burros Act (at least so far as it is based on the notion of fifth amendment taking) is to fundamentally undermine all of the environmental protection schemes which Congress and state legislatures in their wisdom may undertake to enact.
 
 
 32
 Notwithstanding the court's contrary assertion, there is to my mind nothing legally unique about this Act. What the court has said about the federal government's relationship to the wild horses and burros may be equally said about the wild animals regulated by the acts set forth above. As the court has said about the wild horses:
 
 
 33
 Since the government has assumed jurisdiction over the horses [eagles, bears, foxes, panthers, wolves etc.] under the Act[s] it has thereby taken the exclusive and complete control of the horses [animals] and also the duty to manage them. As to control, the Act[s] and regulations permit no one else to move the horses [animals] no matter where they are. No one else can manage the horses [animals]. Land owners cannot move them from their land. If the horses [animals] stray from public lands onto private lands the owners must request the government to remove the horses [animals] if they want them off their land.
 
 
 34
 Opinion of the Court, supra at 5-6 (bracketed materials added).
 
 
 35
 Indeed, under some of the acts, there are circumstances in which the private owners have no remedy whatever. See, e.g., situations in which removal or destruction of endangered species will further endanger or deplete the population. 50 C.F.R. Sec. 2223(c) (1983).
 
 
 36
 What the foregoing illustrates is simply that the Wild and Free-Roaming Horses and Burros Act is legally nothing more nor less than a run-of-the-mill regulatory scheme enacted by Congress to insure the survival of a particular species of wild animals. Once that fact is acknowledged, and it must be, the correctness of the trial court's conclusion that the grazing of these wild horses and burros on private land did not constitute a fifth amendment taking flows inexorably.
 
 
 37
 In several recent decisions the Supreme Court has reaffirmed the long standing constitutional rule that regulatory actions mandated by Congress do not constitute a taking for the purposes of the fifth amendment. In Andrus v. Allard, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), the Court clarified its stance on the takings clause:
 
 
 38
 Penn Central Transportation Co. v. New York City, 438 U.S. 104, 123-128 [98 S.Ct. 2646, 2658-2661, 57 L.Ed.2d 631] (1978), is our most recent exposition on the Takings Clause. That exposition need not be repeated at length here. Suffice it to say that government regulation--by definition--involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by purchase. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922); see Penn Central, supra, 438 U.S. at 124, 98 S.Ct. at 2659.
 
 
 39
 Id. at 65, 100 S.Ct. at 326; see Loretto v. Teleprompter Manhattan City Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).
 
 
 40
 The facts of this case do not begin to reach the extreme of burdens placed on property holders which have been sustained against claims of fifth amendment taking without just compensation. See, e.g., Goldblatt v. Town of Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962) (ordinance prohibiting excavation below certain level did not constitute a taking of land used for sand and gravel mining); Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (statute which mandates the destruction of red cedar trees in order to protect apple orchards held not to constitute a taking); Euclid v. Ambler Realty Co., 272 U.S. 365, 384, 47 S.Ct. 114, 117, 71 L.Ed. 303 (1926) (enactment of zoning ordinance limiting uses of unimproved property reducing property's value by seventy-five percent did not constitute a taking); Hadacheck v. Sebastian, 239 U.S. 394, 405, 36 S.Ct. 143, 143, 60 L.Ed. 348 (1915) (ordinance precluding the manufacture of brick did not constitute a taking even though it reduced value of petitioner's land to less than one-tenth its prior value).
 
 
 41
 Plaintiffs in this case have not even argued, much less put on proof that they have been deprived of all beneficial use of their land. In analyzing these cases challenging regulatory schemes under a claim of fifth amendment rights, neither this court, the Supreme Court, nor any other court has ever divided the property owners' interest into sections such as mouths full of forage (individual lambs, individual trees), or high rise buildings as opposed to vastly less profitable low density development. Indeed, in Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928), the Supreme Court rejected a taking without just compensation attack on a regulatory scheme even though the state of Virginia through its own personal agents went on the property owner's land to cut down and remove trees to benefit apple orchard owners at the direct expense of red cedar owners. Id. at 279, 48 S.Ct. at 247. That case is a much stronger case than the present one for finding a taking because in Miller the government's scheme was designed to protect apple trees on the lands of private land owners, not the broad direct national interest as in this case.
 
 
 42
 There is not the slightest hint in the cases to suggest that the government's interest in preserving the ecological environment for the entire nation is any less legally important than Virginia's interest in the misfortunes of apple growers. This case is an even stronger case than Miller for upholding government regulation from an attack under the takings clause. Here the shift in burdens and benefits takes place between public and private parties, rather than a shift between two private parties. Miller. In either case the government has determined that a shift in the burden to a private individual or individuals was required for the public benefit.
 
 
 43
 This regulatory scheme, as all regulatory schemes, imposes substantial burdens on many owners of property interests. Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928). There remains only one point to be considered. That is whether the congressional attempts to ameliorate the burden on adjancent property holders some how mystically converts that burden into a fifth amendment taking. In light of all of the cases, it cannot be doubted that Congress, in the absence of an allegation or showing that the residual interest of the property owner in his entire parcel is rendered substantially useless, could altogether prohibit interference with the wild horses and burros without providing an ameliorative scheme.
 
 
 44
 Justice Holmes, in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413-14, 43 S.Ct. 158, 159-60, 67 L.Ed. 322 (1922), characterized a taking as control by the government of a person's use of property which virtually destroys the property's value. It is important not to lose focus of the fact that although there is an allegation that the grazing value of the private checkerboard land is substantially reduced by the wild horses and burros, no allegation or offer of proof even suggests that the grazing value is completely destroyed or even destroyed to the point of being essentially useless.
 
 
 45
 Although there was a request for only nominal damages, if this court's opinion stands, it forms the predicate for a damage action for the full amount of "taken" property consumed by wild horses from the date of this judgment forward. If a principled course is followed hereafter, it also lays the predicate for fifth amendment compensation for all damage to livestock and crops caused by all animals which fall under the control and management of the Department of Interior.
 
 
 46
 The opinion of the court is even more troublesome because it is impossible to determine from the court's opinion precisely what constitutes the taking under this sweeping new notion of the fifth amendment or at what point one begins to measure the taking. As the court itself has said of its opinion, "The allegations as to a taking do not refer or rely on a single event or occurrence but to a continued course of action during the year for a period of years." Opinion of the Court, supra at 795. It apparently does refer to forage because of the court's citation to personal property as falling within the protection of the fifth amendment. Indeed, as presently structured, the court's opinion gives the trial court an imponderable task. On remand there are no damages to assess except nominal ones. The court's mandate reads:
 
 
 47
 The judgment of the trial court is reversed as to the issue of the taking of forage for a factual determination whether such forage was taken by the continued failure to manage the horses and by permitting their continued use of private lands by the increased number of horses and burros since 1971.
 
 
 48
 Opinion of the Court, supra at 795.
 
 
 49
 The court's opinion does not give us or the trial court the guidance necessary to determine whether the taking consists of all forage consumed by all wild horses on private land from the moment they enter the private land in the checkerboard area; all forage consumed and damage caused from the moment that there is a request for removal of horses from private lands; all forage consumed by some number of horses in excess of some undetermined reasonable number; the forage taken by all horses grazing on private lands in excess of the numbers which were there in 1971; forage consumed under one of the foregoing categories but only after a lapse of reasonable time after notice to the Secretary to remove a particular number of horses; or some other imponderable assessment for which the trial court is given inadequate theoretical guidance.
 
 
 50
 Though it is not clear to me, apparently the court bases its conclusion that this wild life management scheme has become an instrument of taking because of the ameliorative clause directing the Secretary to remove wild horses from private lands on request. This ameliorative clause in substance is no different from that in the bald eagle act, the endangered species act, or numerous other acts. That the language of the ameliorative provision is mandatory in form does not change the fundamental nature of the act from one regulating a national asset into an instrument of taking of private property any more than the ameliorative provisions of miriads of other regulatory schemes. At most, the mandatory language of this provision raises either a question of mandamus (which unlike the court I do not believe is before us because the government has not cross-appealed from the grant of mandamus[1]) or an issue of whether Congress has in effect authorized a private right of action. As to this latter point, the Supreme Court's recent cases make clear that unless Congress has expressly or otherwise clearly manifest an intent to create a private right of action, no such private right of action exists. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 374-78, 102 S.Ct. 1825, 1837-1839, 72 L.Ed.2d 182 (1982); Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); see also California v. Sierra Club, 451 U.S. 287, 292-93, 101 S.Ct. 1775, 1778-79, 68 L.Ed.2d 101 (1981).
 
 
 51
 All of the unsound consequences and the absence of any clearly articulated theory of what the cause or instrument of the taking is could and legally should be avoided by beginning at the legally unavoidable conclusion that the Act is a regulatory scheme by which Congress intends to insure the survival of wild horses and burros just as it has done in the case of numerous other birds and animals as well as in all other regulatory schemes for the benefit of the general public.
 
 
 52
 I agree, however, with the court that the denial of damages against the Secretary should be affirmed.
 
 
 
 [1]
 On March 3, 1981, and March 13, 1981, the trial court granted defendants' and plaintiffs' respective motions for partial summary judgment. The March 13 order granted plaintiffs' request for mandamus to have the horses removed. Record, vol. 3 at 518. Defendants appealed that ruling but that appeal was dismissed by this court for want of jurisdiction because not all claims had been settled. Id. at 529-38. In the current appeal the defendants have not cross-appealed the issue of mandamus nor do they allege that the granting of mandamus was error