799 F.2d 1423
 17 Envtl. L. Rep. 20,380
 MOUNTAIN STATES LEGAL FOUNDATION, a nonprofit corporation,
on behalf of its members who use and enjoy the public lands
in the Rock Springs, Wyoming area, and the Rock Springs
Grazing Association, which owns and leases lands in the Rock
Springs, Wyoming area, Plaintiffs-Appellants,
v.
Donald P. HODEL, Secretary of the Interior, James W. Byrd,
as United States Marshal of the District of Wyoming, Frank
Gregg, individually, former Director of the Bureau of Land
Management, and the United States of America, Defendants- Appellees,
Environmental Defense Fund, Inc., National Audubon Society,
National Wildlife Federation, and Defenders of
Wildlife, Amici Curiae.
 No. 82-1485.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 22, 1986.
 
 Constance E. Brooks, Mountain States Legal Foundation, Denver, Colo. (R. Norman Cramer, Jr., Mountain States Legal Foundation, Denver, Colo., and Calvin Ragsdale of Marty & Ragsdale, Green River, Wyo., with her on supplemental brief on rehearing), for plaintiffs-appellants.
 Donald Alan Carr (Peter R. Steenland, Jr. and Dianne H. Kelly, and F. Henry Habicht II, Asst. Atty. Gen., with him on supplemental brief on rehearing), Dept. of Justice, Washington, D.C., for defendants-appellees.
 Michael J. Bean of Environmental Defense Fund, Inc., Hope M. Babcock of National Audubon Society, and Jerry Jackson, National Wildlife Federation, Washington, D.C., submitted a joint brief of amici curiae.
 Brian B. O'Neill, Amy B. Bromberg and Alan M. Anderson of Faegre & Benson, Minneapolis, Minn., submitted a brief of amicus curiae for Defenders of Wildlife.
 Before HOLLOWAY, Chief Judge, and SETH, BARRETT, McKAY, LOGAN, SEYMOUR and MOORE, Circuit Judges.
 McKAY, Circuit Judge.
 
 
 1
 The Mountain States Legal Foundation and the Rock Springs Grazing Association (collectively referred to hereinafter as "the Association") brought this action on behalf of their members against the Secretary of the Interior and other government officials to compel them to manage the wild horse herds that roam public and private lands in an area of southwestern Wyoming known locally as the "checkerboard."[1] The checkerboard comprises over one million acres of generally high desert land and has been used by the Association since 1909 for the grazing of cattle. The lands involved in this case are in the Rock Springs District of the checkerboard, an area approximately 40 miles wide and 115 miles long. Record, vol. 1 at 17; Appellant's Brief at 5-6. In this area of the checkerboard, the Association's cattle roam freely on property owned by the Association and on the alternate sections of land owned by the federal government. Thousands of wild horses also roam these lands.
 
 
 2
 The Association sought a declaratory judgment that the Secretary had mismanaged the wild horses, and that the Secretary's failure to remove wild horses from the Association's lands was arbitrary and capricious. On this basis, the Association also sought a writ of mandamus to compel the Secretary to remove the wild horses from its lands and to reduce the size of the wild horse herds on adjacent public lands. The Association also sought damages under the Fifth Amendment for the alleged uncompensated taking of its lands. For this alleged taking, the Association sought to recover $500,000 from the Director of the Bureau of Land Management ("BLM") and ten dollars from the United States.
 
 
 3
 The district court granted the Association's petition for mandamus, dismissed the Association's claim against the Director of the BLM, and granted summary judgment for the government on the Association's Fifth Amendment takings claim. The Association appealed the dismissal of the claim against the Director and the grant of summary judgment. The government did not challenge the grant of mandamus on appeal. We affirmed the dismissal, but reversed and remanded the grant of summary judgment, holding that an unresolved factual issue precluded a summary determination of the takings claim. Mountain States Legal Foundation v. Clark, 740 F.2d 792 (10th Cir.1984), vacated sub nom. Mountain States Legal Foundation v. Hodel, 765 F.2d 1468 (10th Cir.1985).[2] We granted the government's petition for rehearing en banc to consider whether the Secretary's failure to manage the wild horse herds, in accordance with the requirements of the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. Secs. 1331-1340 (1982), gives rise to a claim for a taking of the Association's property under the Fifth Amendment. We also consider whether the trial court properly dismissed the Association's claim against the Director of the BLM.
 
 
 4
 Wild horses and burros are the progeny of animals introduced to North America by early Spanish explorers. They once roamed the western rangelands in vast herds. But over time, desirable grazing land was fenced off for private use, while the animals were slaughtered for sport and profit. The herds began to dwindle, and the remaining animals were driven to marginal, inhospitable grazing areas. Alarmed at decline of these herds, Congress in 1971 enacted the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. Secs. 1331-1340 (1982), to protect the wild horses and burros from "capture, branding, harassment, or death." Id Sec. 1331. According to congressional findings, these "living symbols of the historic and pioneer spirit of the West" had been cruelly slain, used for target practice, and harassed for sport. S.Rep. No. 242, 92d Cong., 1st Sess., reprinted in 1971 U.S.Code Cong. & Ad.News 2149, 2149. Congress also found that the wild horses and burros had been exploited by commercial hunters who sold them to slaughterhouses for the production of pet food and fertilizer. Id.; see also Johnston, The Fight to Save a Memory, 50 Texas L.Rev. 1055, 1056-57 (1972).
 
 
 5
 Established under authority granted Congress by the Property Clause of the Constitution,[3] the Act declares wild horses and burros to be "an integral part of the natural system of the public lands," 16 U.S.C. Sec. 1331 (1982), and mandates that the animals be managed "as components of the public lands." Id. Sec. 1333(a). The Act directs the Secretary to protect and manage the wild horses and burros "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." Id. Section 1334 of the Act provides that, if wild horses or burros stray from public lands onto privately-owned land, the owner of such lands may inform a U.S. Marshal or an agent of the Secretary, who shall arrange to have them removed. Any person who "maliciously causes the death or harassment of any wild free-roaming horse or burro" is subject to criminal penalties. Id. Sec. 1338(a)(3). The Department of the Interior has defined "malicious harassment" as
 
 
 6
 any intentional act which demonstrates a deliberate disregard for the well-being of wild free-roaming horses and burros and which creates the likelihood of injury, or is detrimental to normal behavior patterns of wild free-roaming horses and burros including feeding, watering, resting, and breeding. Such acts include, but are not limited to, unauthorized chasing, pursuing, herding, roping, or attempting to gather or catch wild free-roaming horses and burros.
 
 
 7
 43 C.F.R. Sec. 4700.0-5(k) (1985).
 
 
 8
 The Association alleges that the Secretary has disregarded its repeated requests to remove wild horses from its lands, that it is prohibited by section 1338 of the Act from removing the wild horses itself, and that the wild horses grazing on its lands have eroded the topsoil and consumed vast quantities of forage and water. In support of its Fifth Amendment claim, the Association argues that "it is the panoply of management responsibilities set forth in the Act and its regulations, including [section 1334], which ... subject the United States to liability due to its pervasive control over the horses' existence." Appellant's Supp. Brief on Rehearing En Banc at 8 (emphasis added). In our prior opinion in this case, a panel of this court, with one judge dissenting, found that the government's "complete and exclusive control" over wild horses made the Wild Free-Roaming Horses and Burros Act "unique" in the field of wildlife protection legislation. 740 F.2d at 794. This degree of control, the court said, was potentially "significant" in determining the government's liability under the Fifth Amendment. Id. With the benefit of additional briefing and oral argument, it is now apparent to us that, in the area of wildlife protection legislation, there is nothing novel about the nature and degree of the government's control over wild horses and burros.
 
 
 9
 At the outset, it is important to note that wild horses and burros are no less "wild" animals than are the grizzly bears that roam our national parks and forests. Indeed, in the definitional section of the Act, Congress has explicitly declared "all unbranded and unclaimed horses and burros on public lands" to be "wild horses and burros." 16 U.S.C. Sec. 1332(b) (1982) (emphasis added).[4]
 
 
 10
 It is well settled that wild animals are not the private property of those whose land they occupy, but are instead a sort of common property whose control and regulation are to be exercised "as a trust for the benefit of the people." Geer v. Connecticut, 161 U.S. 519, 528-29, 16 S.Ct. 600, 604, 40 L.Ed. 793 (1896), overruled on other grounds, Hughes v. Oklahoma, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979).[5] The governmental trust responsibility for wildlife is lodged initially in the states, but only "in so far as its exercise may not be incompatible with, or restrained by, the rights conveyed to the Federal government by the Constitution." Id. at 528; see also Martin v. Lessee of Waddell, 41 U.S. (16 Pet.) 367, 410, 10 L.Ed. 997 (1842). Neither state nor federal authority over wildlife is premised upon any technical "ownership" of wildlife by the government. Although older decisions sometimes referred to government "ownership" of wildlife, that language has been deemed "a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource." Toomer v. Witsell, 334 U.S. 385, 402, 68 S.Ct. 1156, 1165, 92 L.Ed. 1460 (1948). As the Supreme Court declared, "[I]t is pure fantasy to talk of 'owning' wild fish, birds, or animals. Neither the States nor the Federal Government ... has title to these creatures until they are reduced to possession by skillful capture." Douglas v. Seacoast Products, Inc., 431 U.S. 265, 284, 97 S.Ct. 1740, 1751, 52 L.Ed.2d 304 (1977) (citing Missouri v. Holland, 252 U.S. 416, 434, 40 S.Ct. 382, 383, 64 L.Ed. 641 (1920)); Geer, 161 U.S. at 539-40, 16 S.Ct. at 608 (Field, J., dissenting).
 
 
 11
 In exercising their powers "to preserve and regulate the exploitation of an important resource," both the state and federal[6] governments have often enacted sweeping and comprehensive measures to control activities that may adversely affect wildlife. For example, the Marine Mammal Protection Act, 16 U.S.C. Secs. 1361-1407 (1982 & Supp. II 1984), establishes plenary federal authority for the conservation of marine mammals and preempts entirely state laws pertaining to their taking. Id. Sec. 1379(a). While the Wild and Free-Roaming Horses and Burros Act makes it illegal to "maliciously" cause the death or harassment of a wild horse or burro, Id. Sec. 1338(a)(3) the Marine Mammal Protection Act establishes a federal moratorium of indefinite duration against any "taking" of a marine mammal, a term defined to include harassing, hunting, capturing, or killing, whether done maliciously or not. Id. Sec. 1362(12). Indeed, even unintentional, inadvertent takings that occur incidental to an otherwise lawful activity are strictly regulated and, for "depleted" marine mammal species, prohibited altogether. Id. Sec. 1371(a)(4)(A), (5)(A). These prohibitions apply despite the fact that the hearty appetites of some marine mammal species for fish and shellfish often put them in conflict with human competitors for the same resource. Moreover, the mere presence of sea otters in an area may restrict the rights of oil companies or developers to exploit resources that would otherwise produce handsome returns. See H.R.Rep. No. 124, 99th Cong., 1st Sess. 16 (1985). Despite their losses, those individuals and corporations are prohibited from "taking" the otters, and they are unable to call upon the government to remove them--as a private landowner can do when bothered by wild horses. See id. at 19.
 
 
 12
 Another wildlife species, the bald eagle, is protected not by one federal law, but by three: the Migratory Bird Treaty Act, 16 U.S.C. Secs. 703-712 (1982), the Bald and Golden Eagle Protection Act, 16 U.S.C. Secs. 668-668d (1982) and (in 48 states at least) the Endangered Species Act, 16 U.S.C. Secs. 1531-1543 (1982 & Supp.1984). Together, these statutes authorize a degree of federal control at least as "complete and exclusive" as that provided by the Wild Free-Roaming Horses and Burros Act. Indeed, in many respects their commands are far more sweeping. For example, not only is it illegal under each of these laws to capture or kill bald eagles, but the Bald and Golden Eagle Protection Act prohibits removing or destroying their nests or collecting their feathers. 16 U.S.C. Sec. 668(a) (1982).[7]
 
 
 13
 In addition, the Endangered Species Act makes it illegal to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" any endangered species or attempt to do so, again without regard to whether such actions are done maliciously. 16 U.S.C. Secs. 1532(19), 1538(a) (1982). The prohibition against "harming" an endangered species is especially broad, having been construed to mean that one who maintains on his own land grazing animals that so modify natural habitat as to cause indirect injury to endangered species can be required to remove those grazing animals from his land. Palila v. Hawaii Department of Land & Natural Resources, 471 F.Supp. 985, 995, 999 (D.Hawaii 1979), aff'd, 639 F.2d 495 (9th Cir.1981).[8] Thus, even though eagles and other endangered species often prey on privately-owned livestock and poultry, the Endangered Species Act prohibits self-help measures which have the effect of "harming" such predators.
 
 
 14
 With respect to each of these federal wildlife protection statutes, the degree of governmental control over activities affecting the wildlife in question cannot be said to be different in character from that mandated by the Wild and Free-Roaming Horses and Burros Act. Indeed, in some of these examples, the governmental control over the wildlife is more pervasive, more sweeping, and more restrictive than that provided by the Wild Free-Roaming Horses and Burros Act.
 
 
 15
 Many state wildlife conservation laws provide similar, comprehensive control over activities affecting protected species. Most states, for example, have enacted endangered species laws containing prohibitions that parallel those contained in federal wildlife protection laws. See, e.g., Cal. Fish & Game Code Secs. 2050-2098 (West 1984 & Supp.1986); Colo.Rev.Stat. Secs. 33-2-101 to -108 (1984); Ga.Code Ann. Secs. 27-3-130 to -132 (1986); Ill.Ann.Stat. ch. 8, Secs. 331-341 (Smith-Hurd 1975 & Supp.1986); Ind.Code Ann. Secs. 14-2-8.5-1 to -15 (Burns 1981 & Supp.1986); Iowa Code Ann. Secs. 109A.1-10 (West 1984); Md.Nat.Res.Code Ann. Secs. 10-2A-01 to -09 (1983 & Supp.1985); Neb.Rev.Stat. Secs. 37-430 to -438 (1984).
 
 
 16
 The foregoing discussion demonstrates the fallacy in the Association's argument that the wild horses are, in effect, instrumentalities of the federal government whose presence constitutes a permanent governmental occupation of the Association's property. In structure and purpose, the Wild Free-Roaming Horses and Burros Act is nothing more than a land-use regulation enacted by Congress to ensure the survival of a particular species of wildlife. It is not unique in its impact on private resource owners.
 
 
 17
 Of the courts that have considered whether damage to private property by protected wildlife constitutes a "taking," a clear majority have held that it does not and that the government thus does not owe compensation. The Court of Claims rejected such a claim for damage done to crops by geese protected under the Migratory Bird Treaty Act in Bishop v. United States, 126 F.Supp. 449, 452-53, 130 Ct. Cl. 198 (1954), cert. denied, 349 U.S. 955, 75 S.Ct. 884, 99 L.Ed. 1279 (1955). The United States Court of Appeals for the Seventh Circuit rejected a similar claim under the Federal Tort Claims Act in Sickman v. United States, 184 F.2d 616 (7th Cir.1950), cert. denied, 341 U.S. 939, 71 S.Ct. 999, 95 L.Ed. 1366 (1951). Several state courts have also rejected claims for damage to property by wildlife protected under state laws. See, e.g., Jordan v. State, 681 P.2d 346, 350 n. 3 (Alaska App.1984) (defendants were not deprived of their property interest in a moose carcass by regulation prohibiting the killing of a bear that attacked the carcass because "their loss was incidental to the state regulation which was enacted to protect game"); Leger v. Louisiana Department of Wildlife & Fisheries, 306 So.2d 391 (La.Ct.App.), writ of review denied, 310 So.2d 640 (La.1975) (because wildlife is regulated by the state in its sovereign, as distinct from its proprietary capacity, the state has no duty to control its movements or prevent it from damaging private property); Barrett v. State, 220 N.Y. 423, 116 N.E. 99 (N.Y.Ct.App.1917) (damage to timber by beavers not compensable because the state has a general right to protect wild animals as a matter of public interest, and incidental injury by them cannot be complained of); see also Collopy v. Wildlife Commission, Department of Natural Resources, 625 P.2d 994 (Colo.1981); Maitland v. People, 93 Colo. 59, 63, 23 P.2d 116, 117 (1933); Cook v. State, 192 Wash. 602, 74 P.2d 199, 203 (1937); Platt v. Philbrick, 8 Cal.App.2d 27, 30, 47 P.2d 302, 304 (1935). But see State v. Herwig, 17 Wis.2d 442, 117 N.W.2d 335 (1962); Shellnut v. Arkansas State Game & Fish Commission, 222 Ark. 25, 258 S.W.2d 570 (1953).
 
 
 18
 The majority view that rejects takings claims for damage caused by protected wildlife is consistent with the Supreme Court precedent that controls our decision. In Andrus v. Allard, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), the Court clarified its stance on the takings clause:
 
 
 19
 Penn Central Transportation Co. v. New York City, 438 U.S. 104, 123-128 [98 S.Ct. 2646, 2658-2661, 57 L.Ed.2d 631] (1978), is our most recent exposition on the Takings Clause. That exposition need not be repeated at length here. Suffice it to say that government regulation--by definition--involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by purchase. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413 [43 S.Ct. 158, 159, 67 L.Ed. 322] (1922); see Penn Central, supra, at 124 [98 S.Ct. at 2659].
 
 
 20
 The Takings Clause, therefore, preserves governmental power to regulate, subject only to the dictates of " 'justice and fairness.' " Ibid.; see Goldblatt v. Hempstead, 369 U.S. 590, 594 [82 S.Ct. 987, 990, 8 L.Ed.2d 130] (1962). There is no abstract or fixed point at which judicial intervention under the Takings Clause becomes appropriate. Formulas and factors have been developed in a variety of settings. See Penn Central, supra, at 123-128 [98 S.Ct. at 2658-2661]. Resolution of each case, however, ultimately calls as much for the exercise of judgment as for the application of logic.
 
 
 21
 Id. at 65, 100 S.Ct. at 326; see Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). More recently, in Hodel v. Virginia Surface Mining & Reclamation Association, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), overruled on other grounds, Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the Court emphasized that, in cases involving alleged unconstitutional takings of private property, it
 
 
 22
 "has generally 'been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons.' Rather, it has examined the 'taking' question by engaging in essentially ad hoc, factual inquiries that have identified several factors--such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the government action--that have particular significance." Kaiser Aetna v. United States, 444 U.S. 164, 175 [100 S.Ct. 383, 390, 62 L.Ed.2d 332] (1979) (citations omitted).
 
 
 23
 Id. at 295, 101 S.Ct. at 2370.
 
 
 24
 In an unbroken line of cases, the Supreme Court has sustained land-use regulations that are reasonably related to the promotion of the public interest, consistently rejecting the notion that diminution in property value, standing alone, constitutes a taking under the Fifth Amendment. See, e.g., Goldblatt v. Town of Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962) (ordinance prohibiting excavation below certain level did not constitute a taking of land used for sand and gravel mining); Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (statute which mandates the destruction of red cedar trees in order to protect apple orchards held not to constitute a taking); Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (enactment of zoning ordinance limiting uses of unimproved property reducing property's value by seventy-five percent did not constitute a taking); Hadacheck v. Sebastian, 239 U.S. 394, 405, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (ordinance precluding the manufacture of brick did not constitute a taking even though it reduced value of petitioner's land to less than one-tenth its prior value). In the regulatory context, the Court has said, "the 'taking' issue ... is resolved by focusing on the uses the regulations permit." Penn Central Transportation Co. v. New York City, 438 U.S. 104, 131, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978).
 
 
 25
 It is well settled that a land-use regulation may effect a taking if it "does not substantially advance legitimate state interests ... or denies an owner economically viable use of his land...." Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) (citations omitted). But in Kleppe v. New Mexico, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976), the Supreme Court recognized the important governmental interest in preserving wild horses and burros in their natural habitat, citing congressional findings that their preservation would " 'contribute to the diversity of life within the Nation and enrich the lives of the American people.' " Id. at 535, 96 S.Ct. at 2289 (citing 16 U.S.C. Sec. 1331 (1970 ed., Supp. IV)). The provisions of the Wild Free-Roaming Horses and Burros Act advance this important governmental interest.
 
 
 26
 The Association has not argued, or even suggested that the Act deprives it of the "economically viable use" of its property. Rather, it contends that the consumption of forage by the wild horses, standing alone, requires the government to pay just compensation. In determining whether a particular land-use regulation deprives a property owner of the "economically viable use" of his land, the court must examine the impact of the regulation on the property as a whole. Penn Central, 438 U.S. at 130-31, 98 S.Ct. at 2662. The Ninth Circuit has explained:
 
 
 27
 [I]t is well settled that taking jurisprudence does not divide a single parcel into discrete segments or attempt to determine whether rights in a particular segment of a larger parcel have been entirely abrogated. The Supreme Court has long since rejected any contention that denial of the use of a portion of a parcel of property is so bound up with the investment-backed expectations of a claimant that government deprivation of the right to use a portion of the property in issue invariably constitutes a taking, irrespective of the impact of the restriction on the value of the parcel as a whole. Penn Central, supra, 438 U.S. at 130, n. 27, 98 S.Ct. at 2662, n. 27.
 
 
 28
 MacLeod v. Santa Clara County, 749 F.2d 541, 547 (9th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2705, 86 L.Ed.2d 721 (1985).
 
 
 29
 Considering the economic impact on the Association's property as a whole, the Act does not interfere with the Association's "distinct investment-back expectations" of using its property for grazing cattle. Nor does it impair the Association's right to hold the property for investment purposes. See id. at 547 n. 7. Moreover, the Association has not been deprived of its "right to exclude" the wild horses and burros. See supra note 8 (discussion of right to fence property); Kaiser Aetna v. United States, 444 U.S. 164, 179-80, 100 S.Ct. 383, 392-93, 62 L.Ed.2d 332 (1979). Admittedly, the grazing habits of the wild horses have diminished the value of the Association's property. But "a reduction in the value of property is not necessarily equated with a taking." Allard, 444 U.S. at 66, 100 S.Ct. at 327. In this case, the reduction in the value of the property pales in comparison to that sustained in Village of Euclid, 272 U.S. at 384, 47 S.Ct. at 117 (75% of property value lost) and Hadacheck, 239 U.S. at 405, 36 S.Ct. at 143 (92.5% of property value lost).
 
 
 30
 Whether a particular land-use regulation gives rise to a taking under the Fifth Amendment is essentially an ad hoc inquiry. Although the economic burden imposed on the Association is significant, the Association has not even contended that it has been deprived of the "economically viable use" of its lands. In view of the important governmental interest involved here, we conclude that no taking has occurred and that the district court correctly granted summary judgment for the government. Because no taking occurred, we also affirm the trial court's dismissal of the Association's claim against the Director of the BLM.
 
 SETH, Circuit Judge, dissenting:
 
 31
 I must respectfully dissent from the opinion of the majority and from the basic position it represents.
 
 
 32
 This "basic position" seems to be that the case represents a challenge by plaintiffs to the extent of the authority of, and control over the horses, exercised by the BLM. However, no one challenges this authority nor the extent thereof, but instead it is accepted in its fullest extent and it, as the Government suggests, is complete and is exclusive. The consequences of the existence of this authority and the consequences of the failure by the BLM to perform its duties under the Act is instead the basic issue as will be further described.
 
 
 33
 The complaint of owners of grazing lands commenced this action against several federal officials and the United States for the unconstitutional taking, without condemnation proceedings, of forage on their private lands and for damage to their land. The taking, and general damage to the range, it is alleged, resulted from the failure by the defendants to manage herds of wild horses contrary to and in violation of the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. Sec. 1331. Also substantial damages were sought against officials for willfully preventing the proper management of the horses under the Act to the damage of plaintiffs.
 
 
 34
 This case concerns grazing in the southwestern part of Wyoming known as the checkerboard. These lands are so described because alternate sections are private lands and public lands. In the area in question, which is about 115 miles long and 40 miles wide, the Rock Springs Grazing Association composed of a group of ranchers owns or leases the private lands. The area, of course, generally follows the railroad. The land is described as high desert, the forage is very limited, the area is sensitive to overuse, and there are few if any fences to mark property lines. The Grazing Association has been in business since 1909 and has used the area with seasonal variations during that time. The depositions indicate that with the limited forage and a need to use different portions of the area during different seasons a large acreage is required to support a horse or cow.
 
 
 35
 The Government acknowledges that the horses have been using plaintiffs' private lands for grazing; that there has been an overpopulation of horses since the BLM assumed control of them; and that requests have been made by plaintiffs under the Act for it to remove the horses from their private lands. The record shows the horses were not so removed.
 
 
 36
 The Complaint as to the number of horses, states:
 
 
 37
 "Plaintiff Rock Springs Grazing Association is desirous of maintaining and preserving a reasonable number of wild horses in the checkerboard area pursuant to previous understandings with the defendants and other interested parties. The Association has expressed to defendants on numerous occasions its willingness to accomplish the purposes of the Wild Horse Act and allow a reasonable and manageable number of wild horses to remain on Association land."
 
 
 38
 The plaintiffs assert, and the Government agrees, that the complete and exclusive control and management of the horses is in the Government; that this control is complete; that the Government by the express provisions of the Act must remove horses from private lands when requested; that many such requests have been made by plaintiffs but the horses were not removed and continued to consume the forage on plaintiffs' lands.
 
 
 39
 The trial court issued the writ of mandamus and ordered all wild horses removed from the Association's land within one year and a reduction in the wild horse population on the public lands within two years. The trial court eventually dismissed the claim against the BLM director and granted the Government's cross-motion for summary judgment on the unconstitutional taking claim. The plaintiffs relinquished their claim for attorneys' fees and costs. The plaintiffs appeal the dismissal of their claim against the BLM director and the court's order denying damages against the Government.
 
 
 40
 Again it must be emphasized the complaint is that the BLM has specific duties under the Act but has failed to carry them out. These duties relate to the obligation of the agency to control the horses; to move them when the Act requires such action; to capture and remove the horses from the range; and if necessary to sell or to destroy the horses. The Act assumes the ability of the BLM to exercise complete control of the horses. The BLM has assumed it has both the ability and the authority to completely and exclusively control the horses.
 
 
 41
 The Government seeks on appeal to change the issues, the arguments and the contentions of the parties to make it appear that we are concerned here with the issues presented in other cases wherein the authority of the agency is challenged or where it is asserted that the authority is limited. These are the migratory bird cases, the marine mammal cases and the endangered species cases. However, no one here challenges the ability or extent of authority of the BLM to completely control the horses at all times. This is accepted. The ability of the BLM as a practical matter to control the horses wherever they are is a very significant factor, as is its ability to capture, mark, sell and convey title to the horses as would be done as to any domestic animal.
 
 
 42
 This pervasive control placed in the BLM is thus fully acknowledged by all parties as are the active affirmative duties of the agency under the Act. With no challenge to the BLM's authority and with the assertion of the agency that it indeed has such duties and has the exclusive control of the horses the discussion of the cases concerning waterfowl, marine animals and endangered species are interesting historically on the issue of prohibitions on the public, the extent of challenged authority, and are very important in that context but are well outside the issues of this case. We have instead the explicit duties of the BLM acknowledged by it and the admitted failure to perform such duties. Thus we are not exploring the extent, nature and existence of the duties. The agency has admitted facts demonstrating that it has not performed its duties. The case is thus about the consequences of the failure to so perform.
 
 
 43
 As it is easy to overlook this basic issue, it is also easy to overlook just what horses we are concerned with on this appeal. The statute, 16 U.S.C. Secs. 1331-40, provides (by definition) that it covers "all unbranded and unclaimed horses and burros on public lands of the United States." There are no other qualifications. Thus the category of animals covered is determined by their location--not the nature of the animals but instead where they are found. They are not within the Act when found on state land or private land. The "place" separates them from all other horses unbranded and unclaimed running free. If they are not on public land of the United States they are not under the Act. The Regulations further refine this geographically controlled coverage by adding a date--thus those animals "that have used public lands on or after December 15, 1971." No reference whatever is made to the origin or nature of the animals. Thus any unclaimed unbranded horse is within the definition of the Act if it is at the required place at the required time. It is thus apparent that a determined effort was made in drafting to include in the definition for coverage purposes only certain horses by location and date. Nevertheless any horse and all horses here concerned under this test are really domestic animals according to the record. They are not unbranded and unclaimed wild animals--but "all such" horses.
 
 
 44
 Apparently by design, the horses are not referred to in the Act as "wild horses" or "wild animals". There would seem to be no basis for treating them as wild animals for some purposes and not for others as the Government would have us do. The horses cannot be biologically so altered by an Act of Congress into "wild animals". We have seen that certain individuals in the Army were made "gentlemen" by Act of Congress but that may not have been all that successful either.
 
 
 45
 The record shows that the horses here concerned bear recognizable traits or characteristics of particular breeds. These horses in the not too distant past in this area were the ungathered portion of ranch herds maintained by the ranchers as a readily available pool of stock for ranch use and for use by the military. The record shows that particular breeds were from time to time introduced into the herds to improve the quality or characteristics of the pool for specific anticipated uses. Needed horses were easily gathered from time to time.
 
 
 46
 The statute appears to be drawn to completely exclude all state authority in the control or management of the horses. Thus the statute nowhere refers to the horses as "wild animals" which would permit the states to participate and which would also recognize the interest of the citizens of the state therein. To this end control or movement of the horses by a state official or anyone else constitutes a criminal offense. See Kleppe v. New Mexico, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976); (State of New Mexico v. Morton, 406 F.Supp. 1237 (M.D.N.M.1975)).
 
 
 47
 These horses are thus placed in a newly created legal category not wild animals, not estrays, not migratory, not related to treaty obligations but as part of the public lands as the Supreme Court noted. This was an innovative device to exclude state participation and to place exclusive control in the Secretary. This theory is absolutely the only basis advanced to support the jurisdiction of the BLM. The horses are thus expressly and necessarily made a part of the public lands. The Act says they are "components" of the public lands under the "jurisdiction" of the Secretary. Thus they cannot be described as "wild animals", as the Act avoids doing this, but instead are a part of the public lands--a "component" thereof, a part thereof and that alone.
 
 
 48
 The nature of the Government's interest in the public lands is certainly clear and it must be recognized that the interest in the components thereof is of the same nature and character. The Act in no way indicates otherwise. There can thus be no issue of ownership of wild animals.
 
 
 49
 The persons who drafted the statute were thus clear and precise in placing the jurisdiction of the Secretary only on the "component of public land" theory, on his control over the public lands for public use and the Government's ownership thereof. This theory was convincing to the Supreme Court and we should adhere to it.
 
 
 50
 As herein mentioned, the Secretary is required to remove the horses from private land when requested to do so by the Regulations--Sec. 4750.3. The Secretary is so required to act on request, as would be expected when dealing with something he can control and over which he has actually assumed control. Also he must:
 
 
 51
 1. Gather and capture and mark horses under stated circumstances. (Capture methods are described in great length in the Regulations.)
 
 
 52
 2. Relocate horses and move them from place to place. (Removal is described in a separate section of the Regulations.)
 
 
 53
 3. Transport horses.
 
 
 54
 4. Offer horses for adoption (sale) and convey title to them on request as would be typical of all horses under state law.
 
 
 55
 5. See that appropriate use is made of all ranges and multiple use is adhered to.
 
 
 56
 The Regulations state that their objective is to provide procedures "for protecting, managing and controlling" the horses. The term "controlling" is thereafter implemented in the Regulations in detail with the provisions to carry out the statutory duties. In the statement of policy in the Regulations (Sec. 4700.0-6) it is provided that "they ... will be ... controlled...." In Sec. 4730.1 relating to the inventories the Regulation again provides in planning for "control" certain practices shall be followed and the term "control" is again used in the planning section--Sec. 4730.6. This "control" over this component of the public lands must mean that the horses be located and relocated from time to time at places which are in accordance with the management duties of the Secretary and thus where the BLM thinks they should be. No one else can do this--no one else can move them for to do so is a criminal offense.
 
 
 57
 Thus accepting the authority of the BLM as it has assumed it to be, and its undertaking complete control of the horses, its failure to perform its duties as asserted by the plaintiffs, and as the record shows, has caused the consumption and destruction of plaintiffs' property for a public use without compensation. The plaintiffs are thus entitled to compensation and the relief afforded by the trial court.
 
 
 58
 The Bivens cause of action advanced by the plaintiffs has much appeal under these circumstances where its elements seem to be admitted by the officials and the other facts supporting it are not challenged. However, I am not prepared to extend the doctrine to a complete failure to act.
 
 
 59
 The value of forage as a separate item of property ownership is acknowledged by the BLM in its regular fees charged for grazing by permittees. 43 U.S.C. Sec. 315-315q. But more importantly in this consideration are the fees charged by the BLM for livestock which trespass on public lands--Sec. 4720.2(b). These trespass fees are also provided for in the Regulations herein considered and are to be assessed against horses in private ownership which use the public lands without a permit. The BLM by the regular fees and by trespass fees states its view of the value of forage consumed on public land.
 
 
 60
 Forage as a separate item of property is recognized in Wyoming between private entities. Forage is by statute a crop in Wyoming. Wyo.Stat.Ann. Sec. 11-1-101(a)(iii). Crops are there protected. Crops are recognized generally as personal property, a separate property interest, in condemnation actions, see King v. United States, 427 F.2d 767 (Ct.Cl.1970), and under the common law. An owner of stock is liable therefor when he knows that they will go on the land of another.
 
 
 61
 The BLM in this action has acknowledged that it administered the checkerboard area for grazing as if it were one range with the public and the fee land together as a unit. The horses were thus controlled as if there was but one ownership of land and forage and thus managed to use the public land and forage, and plaintiffs' land and forage without a distinction. This consumption of privately owned forage was of course to support the horses for a public purpose.
 
 
 62
 The Government has thus used and caused the consumption of plaintiffs' property for a public purpose. The component horses obviously have gone upon private land and have consumed plaintiffs' forage. This has been on a regular basis as part of the Government's control of the horses and management of the range as a unit.
 
 
 63
 The physical "presence" here is not a casual one nor a random one nor one brought about by the movement of ducks or wild animals or any animals by themselves. We are not concerned with geese flying from place to place nor deer moving about. Instead we are here concerned with the physical presence of one of the components of the Government's land directed and orchestrated on a regular basis by the BLM. This was continuous and pervasive because of the affirmative duties to control placed on the BLM by the Act and the Regulations. It was also because of the significant factor that the area was managed and the horses managed without regard to the ownership of the different tracts within it.
 
 
 64
 The basic elements of a taking are described in Penn Central Transp. Co. v. New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The opinion makes the distinction just referred to when it states that:
 
 
 65
 "[A]ctions that may be characterized as acquisitions of resources to permit or facilitate uniquely public functions have often been held to constitute 'takings.' "
 
 
 66
 The concern is with the condemnation of forage by the Government which took place at the least after the plaintiffs requested removal of the horses from private land, and the BLM refused to perform its duty to remove them. We also have the acknowledgment by the Government that there was an overpopulation of horses on this range when suit was filed. The record shows that the BLM again had taken no steps to perform its statutory duty to remove the excess which necessarily included plaintiffs' land.
 
 
 67
 I would remand the case to the trial court on the issue of the taking of forage from plaintiffs' lands for a factual determination whether such forage was taken by the continued failure to manage the horses and by permitting their continued use of private lands by the increased number of horses and burros since the operative date in 1971. I would further remand for a further consideration of the Bivens issue.
 
 
 68
 I agree with the dissenting opinion by Circuit Judge BARRETT.
 
 
 69
 BARRETT, Circuit Judge, dissenting.
 
 
 70
 I must respectfully dissent. I continue to adhere to the reasoning of the prior opinion by a panel of this court reversing and remanding the grant of summary judgment on the basis that wild free-roaming horses and burros are not "wild animals." Mountain States Legal Foundation v. Clark, 740 F.2d 792 (10th Cir.1984), vacated sub nom. Mountain States Legal Foundation v. Hodel, 765 F.2d 1468 (10th Cir.1985). Assuming, however, that the animals protected under the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. Sec. 1331-1340 (the Act), are "wild animals," I would nonetheless dissent from the majority opinion. RSGA should not be precluded from litigating its "taking" claim as a matter of law given the Act's unique wildlife protection scheme. Summary judgment is inappropriate and this case should be remanded to the district court to determine whether the facts here, i.e., the amount of damage to RSGA's property and the cause of that damage, entitle RSGA to relief under the Taking Clause of the Fifth Amendment.
 
 
 71
 I disagree with the majority's characterization of the Act as "nothing more than a land-use regulation enacted by Congress to ensure the survival of a particular species of wildlife." Mountain States Legal Foundation v. Hodel, maj. op. at 1428. The plain and unambiguous language of the Act makes clear that Congress intended that wild free-roaming horses and burros be maintained on public lands and not on private lands. Unlike the treatment of wildlife in other federal statutes, wild free-roaming horses and burros under the Act are by definition specific to the public lands. As I read the Act, Congress did not intend to burden private landowners but rather intended to have the Government assume the complete responsibility for maintaining as well as protecting these animals.
 
 
 72
 In the section of the Act entitled "Congressional findings and declarations of policies," 16 U.S.C. Sec. 1331, Congress expressly stated: "It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands." (Emphasis added.) Wild free-roaming horses and burros are defined as "all unbranded and unclaimed horses and burros on public lands of the United States...." 16 U.S.C. Sec. 1332(b) (emphasis added). "Range" is defined as "the amount of land necessary to sustain an existing herd or herds of wild free-roaming horses and burros, which does not exceed their known territorial limits, and which is devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands...." 16 U.S.C. Sec. 1332(c) (emphasis added). "Public Lands" is defined as "any lands administered by the Secretary of the Interior through the Bureau of Land Management or by the Secretary of Agriculture through the Forest Service." 16 U.S.C. Sec. 1332(e).
 
 
 73
 The Act directs the Secretary to manage wild free-roaming horses and burros on and as part of the public lands:
 
 
 74
 The Secretary is authorized and directed to protect and manage wild free-roaming horses and burros as components of the public lands, and he may designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation.... The Secretary shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands.
 
 
 75
 16 U.S.C. Sec. 1333(a) (emphasis added). Section 1334 of the Act also makes clear Congress' express intent that wild free-roaming horses or burros be maintained on the public lands and not on private lands: "If wild free-roaming horses or burros stray from public lands onto privately owned lands, the owners of such land may inform the nearest Federal marshall or agent of the Secretary, who shall arrange to have the animals removed." 16 U.S.C. Sec. 1334 (emphasis added). While a private landowner may choose to maintain these animals on his property, id., it is clear under the Act that the Secretaries have an affirmative and mandatory duty to remove wild horses from private lands at the request of landowners, consistent with congressional intent that these horses be maintained on public lands. Therefore, if the Wild Free-Roaming Horses and Burros Act is a land-use regulation, it is only with respect to public, not private lands.
 
 
 76
 The majority not only incorrectly characterizes the Wild Free-Roaming Horses and Burros Act as a land-use regulation, but also inappropriately compares the Act with other federal wildlife statutes. My research reveals that the Wild Free-Roaming Horses and Burros Act is the only federal wildlife act which imposes a duty upon an agency of the federal government to manage and to maintain wildlife specifically on the public lands. Again, assuming arguendo, that wild horses and burros are "wild animals," the Act is nonetheless unique in the duty Congress imposed on the Secretaries of the Interior and Agriculture to maintain and to manage these animals on the public lands. The specific and identifiable duty imposed upon the executive branch to maintain and to manage these animals on public lands is the feature which makes the Act unique among federal wildlife statutes. While other wildlife conservation laws may also authorize and require exclusive governmental control over wildlife, this Act is unique insofar as the complete and total control of the government over wild free-roaming horses and burros is tied to public lands.
 
 
 77
 The "taking" issue before us in this case is specific to the Wild Free-Roaming Horses and Burros Act. Properly stated, the issue is whether damage to private property by wild horses caused by the failure of the Government to remove the horses from private lands at the request of landowners constitutes a violation of the Fifth Amendment Taking Clause under the Act? Assuming that a private landowner's property is damaged by a failure of the Government to maintain and to manage wild horses and burros on public lands as required by the Act, I believe there can be a violation of the Fifth Amendment Taking Clause. Therefore, summary disposition of RSGA's "taking" claim is inappropriate.
 
 
 78
 The Fifth Amendment of the United States Constitution provides in relevant part: "nor shall private property be taken for public use without just compensation." While the Supreme Court has apparently never addressed the issue of whether property damage caused by wild animals can constitute a taking, see generally, Note, "The Liability of the Federal Government for the Trespass of Wild Horses and Burros," 20 Land & Water L.Rev. 493, 506 (1985), the majority applies the "land-use regulation" taking cases to this case. As noted above, I do not believe this is a land-use regulation case nor do I believe this case can be decided as a matter of law based upon prior Supreme Court decisions.
 
 
 79
 The Supreme Court has often stated that there is no "set formula" for determining when justice and fairness require that economic injuries caused by public action (or inaction) must be deemed a compensable taking. Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984) (citations omitted).
 
 
 80
 [W]e have eschewed the development of any set formula for identifying a "taking" forbidden by the Fifth Amendment, and have relied instead on ad hoc factual inquiries into the circumstances of each particular case. To aid in this determination, however, we have identified three factors which have "particular significance:" (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action."
 
 
 81
 Connolly v. Pension Benefit Guaranty Corp., --- U.S. ----, ----, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986) (citations omitted).
 
 
 82
 While the general rule is that a Fifth Amendment taking claim is to be determined on a case by case basis, the Supreme Court has held that a permanent physical invasion by the Government constitutes a taking per se without regard to other factors that a court might ordinarily examine. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 432, 102 S.Ct. 3164, 3174, 73 L.Ed.2d 868 (1982). All other taking claims not involving a permanent physical invasion must be resolved by an ad hoc inquiry considering the factors set forth above. Id. RSGA apparently does not contend that the presence of wild horses upon its property constitutes a permanent physical occupation. Therefore, the resolution of RSGA's taking claim in this case must be made upon a review of the facts in light of the factors articulated by the Supreme Court.
 
 
 83
 The Supreme Court has stated: "The purpose of forbidding uncompensated takings of private property for public use is 'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " Connolly, 106 S.Ct. at 1027, quoting Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). In this case it is not only fair and just that the Government not impose a burden on a few individuals to sustain wild free-roaming horses and burros, but it is also the express intent of Congress that private landowners not be required to share the burden of sustaining these animals which compete with livestock for scarce and valuable high plains forage. RSGA should be given an opportunity to demonstrate how and to what extent it has been harmed by the failure of the Secretaries to remove the horses from its property. The majority concedes that "the economic burden imposed on the Association is significant...." Mountain States Legal Foundation v. Hodel, maj. op. at 1431. In light of the direct impact of the Secretaries' action under the Act on RSGA's land, I am not prepared to hold as matter of law that a compensable "taking" has not occurred in this case. I would therefore reverse the district court's holding that "the use of private lands by excess horses under the Act does not rise to the level of a Fifth Amendment violation" and remand the case to the district court for fact-finding consistent with the Supreme Court's previous holdings regarding "taking" claims.
 
 
 84
 I fully concur in the views expressed by Circuit Judge SETH in his separate dissenting opinion.
 
 
 85
 HOLLOWAY, Chief Judge, joins in the dissents of Circuit Judges SETH and BARRETT.
 
 
 
 [1]
 The "checkerboard" derives its name from the pattern of alternating sections of private and public land which it comprises. The checkerboard scheme of land ownership is a result of the Union Pacific Act passed in 1862. Under the Act, the Union Pacific Railroad Company was awarded the odd-numbered lots of public land along the railbed right-of-way as the company completed each mile of the transcontinental railroad. Today, more than half of the checkerboard remains under federal ownership, while the remainder is held privately
 
 
 [2]
 The panel opinion mistakenly affirmed the trial court's "denial of damages against the Secretary." 740 F.2d at 795 (emphasis added). The Association did not seek damages from the Secretary of the Interior. Rather, it sought damages from the Director of the BLM. See Record, vol. 2, at 15-17 (Amended Complaint); vol. 3, at 516 (dismissal of Director from suit)
 
 
 [3]
 The protection of the wild horses and burros on public lands was upheld as a proper exercise of congressional power under the Property Clause in Kleppe v. New Mexico, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976)
 
 
 [4]
 When the United States Supreme Court considered and upheld the constitutionality of the Act in Kleppe v. New Mexico, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976), it decided the scope of the federal government's authority over "wildlife" on federal lands and referred consistently throughout its opinion to "wildlife" rather than feral or domestic animals. The Court held that "the Property Clause also gives Congress the power to protect wildlife on the public lands, state law notwithstanding." 426 U.S. at 546, 96 S.Ct. at 2295 (emphasis added). The Court's holding purported to extend to "wildlife" even though an amicus curiae brief filed in that case specifically drew the Court's attention to the fact that the horses legislatively deemed wild in the Wild Free-Roaming Horses and Burros Act were in fact feral animals that either had themselves reverted to a wild state or were the progeny of horses that had done so. Brief of Amicus Curiae, International Association of Game, Fish and Conservation Commissioners on the Merits at 4-8, Kleppe v. New Mexico, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). The amicus brief therefore urged the Supreme Court to limit its holding to feral animals and not to address more broadly the question of federal authority over wildlife on federal lands. Id. at 4-13. This the Supreme Court declined to do, thus implicitly accepting Congress' determination to treat the horses as wild. Cf. Key v. State, 215 Tenn. 136, 144, 384 S.W.2d 22, 26 (1964) (feral hogs are wildlife protected by the laws of the state)
 
 
 [5]
 Hughes overruled the narrow holding of Geer by rejecting the view that a state, without violating the Commerce Clause of the Constitution, may prohibit the export of wildlife lawfully taken within the state
 
 
 [6]
 Federal authority for the conservation of wildlife has been upheld under the Constitution's treaty-making power, Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920), commerce power, Douglas v. Seacoast Products, Inc., 431 U.S. 265, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977), and property power, Kleppe v. New Mexico, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976)
 
 
 [7]
 The Bald and Golden Eagle Protection Act was amended in 1978 to authorize the Secretary of the Interior to issue regulations permitting "the taking of golden eagle nests which interfere with resource development or recovery operations." 16 U.S.C. Sec. 668a (1982). No such authority exists with respect to bald eagle nests, however, whether they interfere with resource development or recovery operations and whether they occur on public or private lands. Bald eagles may not be taken unless the Secretary of the Interior specifically issues a permit. Id
 
 
 [8]
 The Endangered Species Act authorizes as an affirmative defense to prosecutions for violations of that Act that the defendant acted to protect himself or another person from bodily harm. 16 U.S.C. Sec. 1540(a)(3), (b)(3) (1982). No similar statutory defense exculpates actions to protect property. Several state courts have held that, as a matter of state constitutional law, a person may kill wildlife contrary to the state's conservation laws where such action is necessary to protect his property. See, e.g., Cross v. State, 370 P.2d 371 (Wyo.1962). No case has yet addressed whether a similar right exists under the United States Constitution, though the bodily injury defense contained in the Endangered Species Act suggests a congressional view that it does not
 Because the Wild Free-Roaming Horses and Burros Act only prohibits the harassment of wild horses when it is done "maliciously," 16 U.S.C. Sec. 1338(a)(3) (1982), it is not clear that the appellants are completely prevented from taking measures to protect their forage from wild horses without running afoul of the proscriptions of the Act. For example, neither Wyoming nor federal law prohibits the Association from fencing out wild horses and burros. In Anthony Wilkinson Livestock Co. v. McIlquam, 14 Wyo. 209, 83 P. 364 (1905), the court upheld a landowner's right to erect a lawful fence to keep out his neighbor's trespassing cattle. Although the fence cut off the neighbor's access to public grazing lands, the court concluded that
 so far as the mere right to build fences on his land is concerned, [a landowner] is not prohibited by any law or rule that we are aware of from building a fence along one, or two, or three sides of his premises, or through the center thereof, or upon any other part of his land, if he so chooses, unless by so doing he invades some right of another, or violates some public statute.
 Id. at 223, 83 P. at 369. In Camfield v. United States, 167 U.S. 518, 17 S.Ct. 864, 42 L.Ed. 260 (1897), the Supreme Court addressed the right of a landowner to enclose his property when it lies in a checkerboard arrangement with public land. In that case, the government maintained that a private landholder could not fence in his odd-numbered lots since to do so would also enclose the even-numbered federal lots. Rejecting the government's argument, the court observed that
 this was a contingency which the government was bound to contemplate in giving away the odd-numbered sections. So long as the individual proprietor confines his inclosure to his own land, the government has no right to complain, since he is entitled to the complete and exclusive enjoyment of it....
 Id. at 528, 17 S.Ct. at 868.