Joe B. FALLINI, Jr., Susan Fallini and Helen Fallini, Plaintiffs,

v.

Donald P. HODEL, Secretary of the Interior; Robert F. Burford, Director of Bureau of Land Management; Edward F. Spang, Nevada State Director, Bureau of Land Management, Defendants.

No. CV S–86–645 RDF.

United States District Court,
D. Nevada.

Nov. 16, 1989.

W.F. Schroder, Jr., Vale, Or., and Ann B. Reaser, Allison, McKenzie, Hartman, Soumbeniotis & Russell, Las Vegas, Nev., for plaintiffs.

U.S. Attorney by David Moynihan, Asst. U.S. Atty., Las Vegas, Nev., Jose Toro, Allan Brock, Charles R. Shockey, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for defendants Animal Protection Institute of America.

ORDER SETTING ASIDE DECISION
OF THE INTERIOR BOARD OF
LAND OF APPEALS

ROGER D. FOLEY, Senior District Judge.

INTRODUCTION

Plaintiffs Joe B. Fallini, Jr., Susan Fallini, and Helen Fallini (the Fallinis) seek judi-

cial review of a decision of the Interior Board of Land of Appeals, *Joe B. Fallini, Jr. et al. v. Bureau of Land Management,* 92 IBLA 200, June 12, 1986. See Doc. No. 17.

## FACTS

Plaintiffs own and graze cattle on over 2700 acres of private land generally known as Twin Springs Ranch in Nye County, Nevada, within the Reveille Allotment, Tonopah Resource Area, Battle Mountain District of the Bureau of Land Management (BLM). They also graze cattle on 160 acres of public land within Reveille Allotment under permit from the BLM.

Over the years, the BLM has issued to the Fallinis a number of permits to install improvements at the major sources of water within the allotment. See Administrative Record ("AR"), Item 26A 2a. The sources of water are on public lands, but the Fallinis hold the rights to that water under Nevada Law. The permits authorize the Fallinis to make improvements at those sources of water so that it may be available for livestock grazing. Virtually all of the stock water within the Reveille Allotment is ground water pumped to the surface by the Fallinis pursuant to BLM improvement permits and state issued appropriation permits. Each permit also requires that the water impounded at those sources will be available to wildlife. The range improvement permit relevant in this case pertains to the artificial water source known as Deep Well.

Pursuant to their BLM improvement permit, the Fallinis installed pumps, gates, and other improvements at Deep Well. Gates were installed in order to facilitate rotation grazing of livestock. Livestock is moved around the grazing lands in order to allow forage to rest and revive. Cattle movement is accomplished by shutting the gates at one water source and opening the gates at another water source. The cattle forage around whichever water source they have access to, thereby, allowing the grazing lands surrounding closed water sources to recover.

In 1971, Congress passed the Wild Free–Roaming Horses and Burros Act, 16 U.S.C. §§ 1331–1340, to protect wild horses and burros on public lands where they were historically found. At that time, approximately 130 wild horses freely roamed within portions of the Revenue Allotment. No horses roamed within the area surrounding Deep Well. By 1984, the number of wild horses within the Reveille Allotment had increased to approximately 1800 head, including several hundred horses which were grazing the land surrounding and drinking water from Deep Well.

In late 1983, the Fallinis installed highway guardrails across the entrances to all of their water facilities within the Reveille Allotment in order to discourage access by wild horses. The guardrails did not affect water access by cattle or wildlife other than the wild horses.

On December 23, 1983 the BLM's manager for the Reveille Allotment issued a proposed decision notifying the Fallinis that the erection of highway guardrails constituted an improvement at the watering facilities and such modification violated the Fallinis' improvement permit because BLM approval for the modification had not been sought or obtained as required by regulations. The proposed decision required removal of the highway guardrails within fifteen days; failure to comply with the proposed order would result in cancellation of the Fallinis' permits.

The Fallinis removed the guardrails at each water source except Deep Well and filed a protest of the proposed decision as it applied to Deep Well. In turn, on May 3, 1984, the BLM's manager cancelled the permit authorizing the Fallinis to make improvements at Deep Well because they had violated the permit's conditions and the applicable authorization regulation, 43 C.F.R. 4140.1(b)(2) by making improvements without first obtaining approval from the BLM.

The Fallinis appealed the BLM decision to an administrative law judge who held that "the [Fallinis] have not violated the conditions of the ... permit involved in this case nor any applicable federal regulations." AR, Item 23. The BLM appealed

to the Interior Board of Land Appeals (IBLA) which reversed the administrative judge. The Fallinis appeal the IBLA's decision.

TABLE OF CONTENTS

| | page |
|---|---|
| INTRODUCTION | 1113 |
| FACTS | 1114 |
| DISCUSSION | |
| I. STANDARD OF REVIEW | 1115 |
| II. ARBITRARY AND CAPRICIOUS STANDARD | 1115 |
|    A. CONSTRUCTION OF PERMIT LANGUAGE | 1116 |
|    B. FAILURE TO CONSIDER IMPORTANT ASPECT OF PROBLEM | 1117 |
|    C. POLITICAL INFLUENCE | 1118 |
|    D. CONCLUSION | 1119 |
| III. BEYOND STATUTORY AUTHORITY AND JURISDICTION | 1119 |
|    A. IMPLIED RESERVATION OF WATER RIGHTS | 1119 |
|    B. STATE LAW CONFLICT WITH FEDERAL LAW | 1121 |
|    C. CONCLUSION | 1121 |
| IV. CONTRARY TO CONSTITUTIONAL RIGHT | 1122 |
|    A. DEPRIVATION OF NEARLY ALL ECONOMICALLY–VIABLE USE OF PROPERTY | 1123 |
|    B. PUBLIC INTEREST | 1123 |
|    C. CONCLUSION | 1124 |
| CONCLUSION | 1124 |

## DISCUSSION

### I. STANDARD OF REVIEW

Final decisions of the Board of Land Appeals within the Department of Interior are reviewable under the Administrative Procedure Act, 5 U.S.C.S. § 706(2) (1980); *Shell Oil Co. v. Kleppe*, 426 F.Supp. 894, 897 (D.Colo.1977), *aff'd*, 591 F.2d 597 (10th Cir.1979). Sec. 706 requires that the reviewing court

> shall decide all relevant questions of law ..., [and] shall ... hold unlawful and set aside agency action, findings and conclusions found to be— ... (A) arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law; (B) contrary to constitutional right ..., or (C) in excess of statutory jurisdiction, authority, or limitations....

5 U.S.C.S. § 706(2)

A district court applying the "arbitrary and capricious" standard is limited to deciding whether there has been a clear error of judgment by the agency and whether the agency action was based on consideration of relevant factors. *Nance v. Environmental Protection Agency*, 645 F.2d 701, 705 (9th Cir.1981), *cert. den.*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981). The scope of judicial review under this standard is narrow, and a reviewing court may not substitute its judgment for that of the agency. *Natural Resources Defense Counsel, Inc. v. Hodel*, 819 F.2d 927, 929 (9th Cir.1987). Moreover, an agency's interpretation of the statute it administers, or of its own regulations, is entitled to deference, although the courts are the final authorities on issues of statutory and regulatory construction. *Id.* The agency's interpretation will be upheld unless it is plainly erroneous or inconsistent with the regulations. *Washington State Health Facilities v. DSHS*, 879 F.2d 677, 681 (9th Cir.1989).

This court must review the agency conclusions that the Fallinis' installation of the highway guardrail across a gate opening to the enclosure at Deep Well was a modification of the range improvement such as to require authorization from the agency. In analyzing the administrative record compiled by the IBLA, this Court is not persuaded that the proper, substantive legal standards were applied and that applicable rules and regulations were correctly interpreted in reaching the decision. *Roberts v. Morton*, 389 F.Supp. 87, 90 (D.Colo.1975), *affirm'd* 549 F.2d 158 (10th Cir.1976), *cert. denied*, 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977).

### II. ARBITRARY AND CAPRICIOUS STANDARD

■ The IBLA decision charged the Fallinis with permit condition violations and a modification of their range improvement permit for Deep Well without obtaining BLM approval in violation of 43 C.F.R. § 4140.1(b)(2). BLM regulations allow for the imposition of civil and criminal penalties for "modifying ... range improvements without authorization...." 43 C.F.R. § 4140.1(b)(2) (1986); *see also*, 43 C.F.R. § 4120.3–3 (requires party to apply for BLM approval before modifying improvements). The Fallinis' range improvement permit approves the construction of

four steel gates at Deep Well. AR, 27A, Exh. 10.

Relying on expert testimony presented by the Fallinis, the IBLA found that although erection of highway guardrails "might be considered as gates, thus, (sic) falling within the parameters of the improvements listed in the permits," 92 IBLA 200, 207 (1986), the technical definition of "gate" was not determinative. *Id.* Instead, the IBLA rested its decision on its reading of the purpose behind the BLM's authorization to construct gates at Deep Well. *Id.* The purpose of the gates is to occasionally prevent water access by cattle and horses in order to further the goals of rotational grazing. The guardrails installed by the Fallinis, however, allow access by cattle while discouraging horses from using the water. The IBLA concluded that the purpose behind placing the guardrails at Deep Well altered the original purpose of the gates in the Fallinis' permit and this constituted a modification.

*A. Construction of Permit Language*

When a decision turns on the meaning of words as the present case does, the decision is one of law to be made by the court. *Stissi v. Interstate & Ocean Transport Co.*, 765 F.2d 370, 374 (2nd Cir.1985). Interpreted as a term in a contract, the word "gate" which appears in the Range Improvement Permit should be attributed its common and ordinary meanings; when a contract provision is unambiguous, the plain meaning of words used control over the construction placed on them by the parties. *Nevada VTN v. General Ins. Co.*, 834 F.2d 770, 773 (9th Cir.1987).

The IBLA decision cannot be upheld, as defendants contend, on the basis that the Range Improvement Permit unambiguously describes "4–Steel gates," and makes no mention of highway guardrails. A "gate" is "an opening for passage in an enclosing wall, fence, or barrier, or a "structure or part of a structure comprising a passageway." *Webster's New International Dictionary* 1038 (2nd ed. 1950) A "guardrail" is a type of "railing" which is "a barrier, as a fence" consisting of "bars of timber or metal extending from one post or support to another." *Webster's, supra,* at 1111, 2054–55 (meanings of "gate," "guardrail," "railing," and "rail"). The plain meaning of "gates" clearly may include the highway guardrails placed on the boundaries of Deep Well.

Defendant argues that the plain meaning of "gate" does not govern because installation of the guardrails violates another provision of the permit requiring that "impounded water" be made available to "wildlife."

The plain meaning of the term "impounded," "to collect (water) for irrigation purposes, or the like," *Webster's, supra,* at 1251, clearly includes water acquired through the Deep Well facility collected for grazing purposes. The term "wildlife" includes living things that are "not tamed or domesticated." *Id.* at 2925, 1427. A "wild horse" is "any undomesticated horse in the natural or feral state." *Id.* at 2926. The plain meaning of "wildlife" for purposes of the Range Improvement Permit and without regard to any congressional statute, includes "wild horses." Although defendants orally stipulated that "wildlife" does not include "wild horses," AR, Item 26, Tr. at 145, a court cannot be controlled by a stipulation if that stipulation is an erroneous view of the law. *United States v. Miller,* 822 F.2d 828, 831–32 (9th Cir.1987).

Fallinis' cannot claim that they have not violated the requirement that "waters ... be available" on the grounds that wildlife and part of the horse population are not discouraged from Deep Well by the guardrail and have water access. Clearly, the water is *not* available to the "discouraged" horses.

A conflict results, however, from construing "gates" to include guardrails while construing the permit condition to exclude the installation of said gate. This conflict creates an ambiguity in the contract. *Economy Forms Corp. v. Law Co.,* 593 F.Supp. 539, 541 (D.Nev.1984). The interpretation of an ambiguous contract is a mixed question of fact and law. *Id.* Rules of construction are a matter of law but are not required to be used where the intent of

the parties is clear from the contract itself. *Id.* Otherwise, 1) the court shall effectuate the intent of the parties in light of the attendant and surrounding circumstances, *Barringer v. Gunderson,* 81 Nev. 288, 402 P.2d 470, 477–78 (1965), and 2) ambiguities are to be construed against the party (in this case the agency) who drafted the agreement or selected the language used. *Caldwell v. Consolidated Realty,* 99 Nev. 635, 638, 668 P.2d 284, 286 (1983).

At the time of issuance in 1967, the BLM permitted a facility for stock watering purposes, but made provision for water access to "wildlife." However, Defendant cannot validly claim that, at the time it was issued, a purpose of the range improvement permit was to provide water to *wild horses,* separately from or coincidentally with domestic livestock, because there were no wild horses within the area of Deep Well in 1966. In addition, it is unreasonable to assume that the Fallinis undertook in 1966 to make a large investment in Deep Well knowing that Fallinis would have to provide such access to wild horses as would frustrate the primary purpose of the Deep Well facility, to provide water access to cattle. Based on the language of the permit and surrounding circumstances in 1967, this court concludes that "wildlife" does not include "wild horses"; installation of the guardrails do not violate the permit conditions.

The IBLA decision, therefore, was arbitrary, and capricious in finding that guardrails were not "gates" and that the permit condition precluded defining guardrails as "gates."

### B. Failure to Consider Important Aspect of Problem

Courts must reject administrative constructions that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement. *Southern California Edison Co. v. Federal Regulatory Commission,* 770 F.2d 779, 782 (9th Cir.1985). An agency also will have acted "arbitrarily" if it has failed to consider an important aspect of the problem before it. *National Wildlife Founda-*

*tion v. F.E.F.C.,* 801 F.2d 1505, 1512 (9th Cir.1986); *New York Council, Assoc. of Civil Technicians v. Federal Labor Relations Auth.,* 757 F.2d 502, 503 (2nd Cir. 1985), *cert. den.,* 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985). Given the congressional intent in enacting the Taylor Grazing Act, a very important aspect of the problem of whether the Deep Well improvement was proper under § 315c included the extent to which such an improvement was necessary to the care and management of the permitted livestock.

The Taylor Grazing Act of 1934 authorized the Secretary of Interior to withdraw or reserve lands which, in his opinion, were "chiefly valuable for grazing and raising forage crops...." 43 U.S.C.S. § 315 (1980). The essential purpose of the Taylor Grazing Act is stated in 43 U.S.C.S. § 315 as being "to promote the highest use of the public lands pending its final disposal." *Id.* The Ninth Circuit in interpreting the title and body of the Act has concluded that "the purpose of the Taylor Grazing act is to stabilize the livestock industry and protect the rights of sheep and cattle growers from interference." *Kidd v. United States Department of Interior, Bureau of Land Management,* 756 F.2d 1410, 1411 (9th Cir. 1985) (Identification of agricultural land is purpose secondary to stabilization of livestock purpose); *United States v. Achabal,* 34 F.Supp. 1, 3 (D.Nev.1940) (In the arid regions of the West commercial success in the livestock industry requires that sheep and cattle be run upon the open range, and the Act intended, in the interest of the stock growers themselves, to define their grazing rights to protect those rights by regulation against interference). The specific provisions pertaining to the Deep Well permit, a "Section 4" permit, clearly illustrate a primary Congressional intent to protect livestock and cattle grazing. 43 U.S. C.A. § 315c (1980). Section 315c authorizes the Secretary to grant permits for the construction of wells or other improvements on the public lands within grazing districts if these are "necessary to the care and management of the permitted livestock." *Id.*

Defendants point to statutory and regulatory provisions as authority establishing that the furtherance of cattle grazing is a primary purpose of the Taylor Grazing Act which, nevertheless, must give way to other congressional mandates pertaining to public lands management and the protection of wildlife, in particular wild horses. Pursuant to the Wild Free–Roaming Horses and Burros Act of 1971 (Wild Horses Act), *as amended*, 16 U.S.C.A. § 1331 (1984), Congress declared that wild, free-roaming horses are to be considered "an integral part of the natural system of the public lands." 16 U.S.C.A. § 1331 (1984).

An amendment or repeal of the primary purpose for which reserved or withdrawn public lands shall be managed should be express to be effective. *Schwenke v. Secretary of Interior*, 720 F.2d 571, 577 (9th Cir.1983). While defendants are correct in pointing out that Congress by various enactments has declared additional purposes for which Taylor Grazing Act lands will be managed by the BLM, there is no indication that Congress has repealed the Act's primary purpose to manage grazing lands so as to stabilize and preserve the livestock industry.

This court has rejected the contention that cattle have a status inferior to wild horses in public lands as a result of congressional enactments after the Taylor Grazing Act of 1934. In *American Horse Protection Association, Inc. v. Frizell*, 403 F.Supp. 1206 (D.Nev.1977), the court held that neither wild horses nor cattle possess any higher status than the other on the public lands. This court rejected arguments that by passage of the Wild Horses Act and application of the multiple-use concept of the Federal Land Policy and Management Act of 1976 (FLPMA), Congress gave wild horses a higher priority in the public lands than other grazers. *Id.* at 1220–21. Congressional action regarding wild horses is consistent with this court's view. Congress enacted amendments to the Wild Horses Act in 1978 precisely because of its concern that "wild horses['] numbers now exceed the carrying capacity of the range ... [and] pose[s] a threat to wildlife, livestock, overall range conditions,

and even to the horses and burros themselves...." *Id.* at 1317, fnte. 34 (quoting 124 Cong.Rec. 19,501 (1978)); *see*, 43 U.S. C.S. § 1901(a)(5), (b)(4) (1980).

The facts indicate that the agency gave preservation of wild horses higher status over cattle, and gave little or no consideration to cattle grazing concerns. AR, Item 26, Tr. at 339. Leslie Monroe, testifying for the BLM admitted that the *only* criteria the BLM considered in determining that the guardrail was an unacceptable modification was the safety of the wild horses. AR, Item 26, Tr. at 315, 323–324, 339, and 362. The Administrative Law Judge found that the BLM's reaction to the guardrail was partially in response to complaints by various wild horse activists. AR, Item 26, Tr. at 324–26 and 350–54. In failing to consider an important aspect of the problem, namely the adverse impact on cattle grazing practices, the agency acted arbitrarily.

### C. Political Influence

Decisions of administrative agencies may also be challenged if unlawful factors, including improper political considerations, have tainted the agency's exercise of its discretion. *Town of Orangetown v. Ruckelshaus*, 579 F.Supp. 15, 20 (S.D.N.Y.1984), *aff'd*, 740 F.2d 185 (2nd Cir.1984). To claim improper political influence on an administrative agency, there must be some factual basis for proving that 1) the content of the pressure on the agency was designed to force it to decide upon factors not made relevant by Congress in the applicable statute; and 2) the agency's determination must have been affected by those extraneous considerations. *Id.*

In this case there exists the requisite factual basis for these contentions. The record shows that the violation was charged partially as a result of political pressure by wild horse activists, and the sensitive nature of wild horse issues, rather than on a "reasoned process of considering the relevant factors pertaining to this problem." AR, Item 26, Tr. at 324–26,

250–54; Item 25, Tr. at 454 and 460; *see, Town of Orangetown*, 579 F.Supp. at 20.[1]

### D. Conclusion

Having determined that the guardrail gate came within the specifications as approved by the BLM, and that the defendants abused their discretion and acted arbitrarily, capriciously and contrary to the law in finding an unauthorized modification to a range improvement, this court finds that 43 C.F.R. § 4140.1(b)(2) was not violated.

### III. BEYOND STATUTORY AUTHORITY AND JURISDICTION

■ Fallinis also argue that the BLM acted beyond its authority and jurisdiction by appropriating the Deep Well water in a manner contrary to applicable state water laws. The Administrative Procedure Act (APA) requires this court to hold unlawful and set aside agency action found in excess of statutory authority or jurisdiction. 5 U.S.C.S. § 706(2)(C) (1980).

Defendants counter that the precedent is well-settled that the United States authority over public lands is plenary and includes within it the right to condition use, even if it interferes with a State's authority. As discussed below, this court does not agree with defendant's reading of the law, and its application to the present case.

Federal law may override state law in the administration of the state permitted water rights asserted in this case if: 1) the federal government has impliedly reserved those water rights by statute; or 2) the

state laws as applied are in conflict with "needful regulations" respecting federal public lands.

### A. Implied Reservation of Water Rights

The rights of the United States to use of the waters of the public domain, being property rights, may be disposed of only as authorized by Congress. U.S. Const. art. IV, § 3, cl. 2; *United States v. California*, 332 U.S. 19, 27, 67 S.Ct. 1658, 1662, 91 L.Ed. 1889, 1893 (1947). The only congressional authorization for private individuals to acquire rights to use waters appurtenant to the public domain is found in the Desert Land Act of 1877, 43 U.S.C.S. § 321 (1980), and its predecessor Acts of July 26, 1866, and July 9, 1870, 43 U.S.C.S. § 661 (1980); *United States v. Cappaert*, 508 F.2d 313, 318 (9th Cir.1974), *aff'd, Cappaert v. United States*, 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976).

The Desert Land Act of 1877 severed soil and water rights on "public lands" and provided that a transfer of federal land out of the public domain after the date of the Act would not pass title to any *unappropriated* appurtenant water; water rights would be acquired in the manner provided by the law of the state of location. *United States v. Cappaert*, 508 F.2d at 320. But state water laws do not apply to "reservations"—lands withdrawn from the public domain. *Id.* Hence, rights to the use of non-navigable waters acquired under authority of the Desert Land Act following procedures prescribed by state law are

---

1. Contrary to Fallinis' argument, the IBLA did not err in holding that "[t]he failure of BLM to require [them] to apply for permission to modify to previous situations is not authority to disregard the regulation in the face of clear modification." Established administrative practices of an agency pertaining to a statute or regulation is entitled to weight as evidence of the meaning of that statute or regulation. *St. Elizabeth Community Hospital v. Heckler*, 745 F.2d 587, 592 (9th Cir.1984) (A court must examine interpretation urged by agency in light of prior administrative interpretation and application); *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345 (1940), *reh. den.*, 311 U.S. 724, 61 S.Ct. 53, 85 L.Ed. 472 (1940); *In re*

*Bergy*, 596 F.2d 952, 980 (C.C.P.A.1979), *aff'd*, 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980). As a general rule, however, implied acquiescence in Fallinis' acts or neglect of duty on the part of officers of the government is no defense to a suit by it to enforce a public right or protect the public interest. *United States v. City and County of San Francisco*, 310 U.S. 16, 31–32, 60 S.Ct. 749, 757–58, 84 L.Ed. 1050, 1060 (1940); *Utah Power and Light Co. v. United States*, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed 791, 818 (1917). The IBLA decision regarding agency interpretation, therefore, cannot be deemed unreasonable on grounds that the agency was bound by past instances in which it impliedly acquiesced in Fallinis' alterations of Deep Well.

good as against the United States and are not affected by subsequent reservation. *See, Id.*

In 1913 and 1939, Nevada enacted statutes acquiring non-navigable waters under the authority of the Desert Land Act by providing that, subject to existing rights, all waters in Nevada belong to the public and may be appropriated as provided by statute, and not otherwise. 508 F.2d at 319. Nevada statute provided that water rights after 1939 could be acquired by obtaining a permit from the state. *Id.* The Fallinis appropriated the rights to the Deep Well water pursuant to Nevada permit in 1950, AR, Item 27T, Exhibit 9. The Fallinis, therefore, had a vested property right in the Deep Well ground water not subject to subsequent implied reservation by the Federal Government as of that date.

Although the Taylor Grazing Act of 1934 may have effected an implied reservation of Deep Well waters for purposes of that act, the Wild Horse and Burros Act of 1971, 16 U.S.C.A. § 1331 (1984), because enacted after 1950 could not have impliedly reserved that water. This court proceeds to determine whether an implied reservation of Deep Well water rights for a Federal purpose was effected by the Taylor Grazing Act.

In determining whether there was a federally reserved water right implicit in a federal reservation of public land the issue is whether the Government intended to reserve unappropriated and thus available water. *Cappaert v. United States*, 426 U.S. 128, 139, 96 S.Ct. 2062, 2069–70, 96 L.Ed.2d 523, 534 (1976). Intent is inferred if the previously unappropriated waters are necessary to accomplish the purposes for which the reservation was created. *Id.* Where water is only valuable for a secondary use of the reservation, however, there arises the contrary inference that Congress

intended, consistent with its express deference to state water law in several areas, that the United States would acquire water in the same manner as any other public or private appropriator. *United States v. State of New Mexico*, 438 U.S. 696, 702, 98 S.Ct. 3012, 3015, 57 L.Ed.2d 1052, 1058 (1978).

As indicated earlier, the Taylor Grazing Act of 1934 authorized the Secretary of Interior to withdraw or reserve lands which, in his opinion, were "chiefly valuable for grazing and raising forage crops...." 43 U.S.C.S. § 315 (1980). The Ninth Circuit in interpreting the title and body of the Act has gone beyond the expression of purpose contained in § 315: "the purpose of the Taylor Grazing act is to stabilize the livestock industry and protect the rights of sheep and cattle growers from interference. *Kidd v. United States Department of Interior, Bureau of Land Management*, 756 F.2d 1410, 1411 (9th Cir. 1985); *United States v. Achabal*, 34 F.Supp. 1, 3 (D.Nev.1940).

Under the aforementioned authority, protection of wildlife or wild horses is merely a "secondary purpose" of the Taylor Grazing Act for which no implied reservation of water rights may be claimed. *See, United States v. New Mexico*, 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978) (Supreme Court held that under the reserved water rights doctrine the United States, as a result of its setting aside the Gila National Forest, was entitled to reserved water rights in the Rio Mimbres River to the extent necessary to preserve timber and a favorable water flow in the Forest, two purposes for which national forests were established, but that the United States did not have reserved water rights for secondary purposes of recreation, aesthetics, wildlife-preservation, or cattle grazing).[2]

---

**2.** The language of the Taylor Grazing Act provides that land will be dealt with under *applicable public land laws* if it is determined that the land is better suited for purposes other than grazing. 43 U.S.C.A. § 315f. Congress in 1971 enacted the Wild Free–Roaming Horses and Burros Act, 16 U.S.C.S. §§ 1331–1340 (1984), to protect wild horses and burros from "capture, branding, harassment, or death." *Id.* at § 1331.

In structure and purpose the Act is nothing more than a land-use regulation enacted by Congress to ensure the survival of a particular species of wildlife. *Mountain States Legal Foundation v. Hodel*, 799 F.2d 1423 (10th Cir.1986). This court, however, need not determine whether the Act effected an implied reservation of water rights for the purpose of ensuring the

## B. State Law Conflict with Federal Law

When Congress enacts legislation respecting public lands and pursuant to the Property Clause,[3] the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause. *Ventura County v. Gulf Oil Corporation*, 601 F.2d 1080, 1083 (9th Cir.1979), *aff'd*, 445 U.S. 947, 100 S.Ct. 1593, 63 L.Ed.2d 782 (1980). Local law applies only to the extent it does not result in a land use which conflicts with the federally designated land use. *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1055 (9th Cir.1985). A conflict between federal and state authorities may arise when the local authorities wish to regulate conduct which Congress has authorized. *Ventura County*, 601 F.2d at 1084. The crucial question is whether federal regulation can be deemed a "needful prescription" respecting the public lands, and whether the activity significantly interferes with the use of the rangeland and the purpose for which it was established. *United States v. Brown*, 552 F.2d 817, 822 (8th Cir.1977), *cert. den.*, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977) (Hunting on the waters in park could significantly interfere with use of park and the purpose for which it was established so federal regulation prohibiting such hunting constituted "needful prescriptions" which overrode state law permitting such hunting).[4]

As discussed earlier, the attempt by the Defendants to require the Fallinis to provide unlimited water access to all of the excessive number of wild horses is not reasonably related to the purpose for which grazing land areas under the Taylor Grazing Act of 1934 were established. The agency act does not amount to a "needful prescription" aimed at furthering congressional objectives regarding the public lands involved because, as discussed above, the agency action failed to take into account the primary purpose for which the lands were withdrawn. Defendants, therefore, have no right based on the Property Clause to jeopardize plaintiff's certified water rights or interfere with the state's authority to regulate water.

## C. Conclusion

Contrary to defendant's assertion, nothing in *United States v. New Mexico*, 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978), gives defendants the right to jeopardize Fallinis' certificated water right or interfere with the state's authority to regulate water under the facts of this case. The agency's action may be set aside as being in excess of statutory authority and jurisdiction. This court may now proceed to analyze whether the agency action is contrary to constitutional rights because it constitutes a "taking" of the Fallinis' water rights by a regulation that has gone "too far."

preservation of wild horses because the Deep Well water was not "unappropriated water" subject to subsequent reservation by the Federal Government in 1971.

Even if that issue were to be adjudicated, revocation or modification of an existing withdrawal should be express to be effective. *Schwenke v. Secretary of Interior*, 720 F.2d 571, 577 (9th Cir.1983). In *American Horse Protection Association, Inc. v. Frizell*, 403 F.Supp. 1206 (D.Nev.1977), the court held that neither wild horses nor cattle possess any higher status than the other on the public lands; the court rejected arguments that by passage of the Wild Horses' Act Congress gave wild horses a higher priority in the public lands than other grazers. *Id.* at 1220–21. It follows that Congress did not intend to reserve water rights for wild horses to the detriment of cattle by passage of the Act.

Given the established primary purpose of the Taylor Grazing Act as indicated in *Kidd* and the absence of an express modification of previously withdrawn public lands in the Wild Horses

and Burros Act, Congress merely expressed secondary purposes with respect to the lands withdrawn under authority of the Grazing Act when it enacted the Wild Horses and Burros Act. Accordingly, the Wild Horses and Burros Act did not effect an implied reservation of water rights for the purpose of ensuring the preservation of wild horse on public domains.

3. The Property Clause of the Constitution provides that "The Congress shall have Power to dispose of and make all needful rules and Regulations respecting the Territory or other Property belonging to the United States...." U.S. Const., art. IV, § 3, cl. 2.

4. This court has no reason to discuss whether the Property Clause is broad enough to permit federal regulation of nonfederal public lands or waters. *See, United States v. Brown*, 552 F.2d 817, 822 (8th Cir.1977).

## IV. CONTRARY TO CONSTITUTIONAL RIGHT

■ The Administrative Procedure Act (APA) also requires this court to hold unlawful and set aside agency action found to be contrary to the Constitution. 5 U.S.C.S. § 706(2)(B) (1980). Subsection (B) includes constitutional claims based on the Fifth Amendment prohibition against "takings" without just compensation. *1902 Atlantic Limited v. Hudson*, 574 F.Supp. 1381, 1406 (E.D.Virg.1983) (Army Corps of Engineers's denial of permit to fill man-made borrow pit for eventual use as an industrial park was arbitrary and capricious and constituted a taking).

No party to this litigation has specifically argued that administrative action constituted a "regulatory taking" in violation of the Fifth Amendment. This constitutional issue, however, may be raised *sua sponte, Aircrash in Bali, Indonesia On April 22, 1974,* 684 F.2d 1301, 1310 (9th Cir.1982), and, under the APA, "[t]o the extent necessary to decision and when presented." Given the mandatory language of the statute requiring this court to review constitutional violations, the phrase "when presented" may properly be understood to mean "when presented" by the facts and briefs of the case. Because the Fallinis have properly invoked § 706 and alleged an improper appropriation of water rights, this court may proceed to decide the takings question and whether the administrative action was "contrary to constitutional right."

To assert a regulatory takings claim, a plaintiff must establish its two components: 1) that the regulation has gone so far that it has "taken" plaintiff's property, and 2) that any compensation tendered is not "just." *Kinzli v. City of Santa Cruz*, 818 F.2d 1449 (9th Cir.1987). A regulation goes too far when it "becomes so onerous that it has the same effect as an appropriation of the property through eminent domain or physical possession." *Herrington v. Sonoma County*, 834 F.2d 1488, 1497–98 (9th Cir.1987), *modified* and *reh. den.*, 857 F.2d 567 (1987), *cert. den.*, — U.S. —, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989).

The Court examines the takings question in essentially ad hoc, factual inquiries that have identified several factors including: the economic impact of the regulation; its interference with reasonable investment backed expectations; and the character of the government action. *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332, 343 (1979) (citations omitted). In order to succeed with a regulatory taking claim, a property owner ordinarily must demonstrate that all or substantially all economically viable use of the property has been denied. *Herrington*, 834 F.2d at 1497. While the Fifth Amendment's just compensation provision is designed to bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole, this principle is inapplicable to cases in which losses sustained by the plaintiffs are the incidental result of reasonable regulation in the public interest. *Christy v. Hodel*, 857 F.2d 1324, 1335 (9th Cir.1988), *cert. den.*, — U.S. —, 109 S.Ct. 3176, 104 L.Ed.2d 1038 (1989).

Of the courts that have considered whether damage to private property by protected wildlife constitutes a "taking," a clear majority have held that it does not, in view of the public interest involved and incidental injury incurred in those cases. *Id.* at 1334–35 (citing *Mountain States Legal Foundation v. Hodel*, 799 F.2d 1423 (10th Cir.1986), *cert. den.*, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987)). Injuries categorized as "incidental" injuries have included deer or moose browsing on crops, mink or skunks killing an owner's chickens, or robins eating a proprietor's cherries. *Christy v. Hodel*, 857 F.2d at 1335 (loss of a number of sheep to grizzly bears did not constitute a "taking" of property). In this case, however, the Fallinis assert that the BLM's order to allow all wild horses free access to Deep Well by tearing down the guardrails has deprived the Fallinis of the economically viable use of Deep Well. Major not incidental injury is alleged to have resulted from governmental action in this case.

### A. Deprivation of Nearly All Economically–Viable Use of Property

Originally, property in the just compensation sense connoted land or some tangible object of ownership. Current notions of property adopt a "bundle of rights" analysis—that is, an analysis based on the notion of a set of legal relations or relationships among persons with respect to things. *See, e.g., Kaiser Aetna v. United States,* 444 U.S. 164, 179, 100 S.Ct. 383, 392, 62 L.Ed.2d 332 (1979). These rights include, among others, the right to possess, use, and dispose of property, and to exclude others from using property. *Id.*

In this case the property involved consists of groundwater available to the Fallinis at Deep Well by state law but withdrawn in accordance with a federal permit allowing construction and maintenance of Deep Well on federal public lands. A water right is real property. *Carson City v. Estate of Lompa,* 88 Nev. 541, 501 P.2d 662 (1972). Owners of water rights possess vested property rights protected from unconstitutional takings although they may withdraw the water only by license from the United States and regardless of whether these water rights derive from ownership of the appurtenant soil or from specific grants by the state. *International Paper Co. v. United States,* 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410 (1931) (U.S. Government's act of withdrawing water from a power canal used by company for company's mill and of then turning it over to other users to further governmental purposes, constituted a "taking" of the company's right to use the water derived from ownership of the uplands or from specific grants by the state, although the company could withdraw water from the river only by license from the United States). The Fallinis' water right, therefore, is protected from unconstitutional takings.

Consumption by wild horses of practically *all* of the Deep Well water as indicated by the record, AR, Item 27, Tr. 139–40, cannot be characterized as an "incidental" result of reasonable regulation. *See also,* Nev.Rev.Stat. § 533.505 (Nevada law considering the illegal watering of 50 head of livestock to be a punishable offense). Because of the excess number of horses using their watering facilities, Fallinis found it necessary to leave the wells open, thereby "wiping out" the rest/rotation method of grazing. AR, Item 27, Tr. at 137–38. Unfettered access of excessive numbers of wild horses to water sources is destroying water and grazing resources. *Id.,* Tr. at 137–40. The wild horses prevent the cattle from getting water, and calves have been beaten down. AR, Item 27, Tr. at 139–40 and Item 26, Tr. at 250.

Furthermore, the purpose of Deep Well water is for grazing cattle, and the Range Improvement Permit provides for and the state permit sanctions only this use. There remains practically no economically viable use to the water right for the Fallinis if its use is, in effect, limited to wild horse use.

The agency order interferes with Fallinis' distinct investment-backed expectations resulting from the government granting of permission to develop Deep Well. *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (the Court held that if the government allowed the public access to a private pond leased and improved by the petitioner then the government would have to compensate the petitioner for the loss of petitioner's right to exclude others from the pond; the government action would interfere with distinct investment-backed expectations because petitioner had expended large sums of money to develop a marina on the pond that connected the pond to a navigable bay and the Pacific Ocean). As in *Kaiser,* the Fallinis' "right to exclude" others from use of their water rights is being taken. The consent of the United States in allowing the costly building of Deep Well for stockwatering subject to certain requirements for wildlife use "led to the fruition" of the expectancy that such requirements would not lead to the almost complete deprivation of water access for stockwatering purposes.

### B. Public Interest

Underfunding may be one reason why there has been no government ordered construction of wells for the benefit of the

growing population of wild horses. But Government cannot force some people alone to bear public burden which, in all fairness and justice, should be borne by the public as a whole. *Christy v. Hodel,* 857 F.2d 1324, 1335 (9th Cir.1988). The force of the "public interest" concerns in preserving wildlife is substantially lessened in this case. The guardrail did not prevent or restrict access by wild horses, but merely discouraged it. AR, Item 27, Tr. at 89–112; Item 26, Tr. at 227–28, and Item 25, Tr. at 536–37. By not allowing cattle grazers to limit water access to less than the excessive number of wild horses, the agency action actually goes against the public concerns indicated by Congress. Congress enacted amendments to the Wild Horses Act in 1978 precisely because of its concern that "wild horses['] numbers now exceed the carrying capacity of the range ... [and] pose[s] a threat to wildlife, livestock, overall range conditions, and even to the horses and burros themselves...." 43 U.S.C.S. § 1901(a)(5), (b)(4) (1980); *American Horse Protection Association, Inc. v. Frizell,* 403 F.Supp. 1206, 1217 (1977).

Defendants may contend that this court should follow the Tenth Circuit which held that damage to private property caused by federally protected wild horses and burros did not constitute a taking under the Fifth Amendment. *Mountain States Legal Foundation v. Hodel,* 799 F.2d 1423, 1431 (10th Cir.1986), *cert. den.,* 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987). In *Mountain States* grazing habits of wild horses and burros protected by the Wild Free–Roaming Horses and Burros Act had diminished the value of the property in question by using plaintiff's private lands for grazing, but the owners were not deprived of all "economically viable use" of their lands. The present case, however, is distinguishable. The court in *Mountain States* noted that plaintiffs' "distinct investment-back expectations" of using its property for grazing cattle was not interfered with because plaintiffs were not deprived of their right to exclude the wild horses and burros and to fence their property. 799 F.2d at 1331. In contrast, the government in this case is interfering with this very "right to exclude" excess numbers of wild horses and burros from Fallinis' water rights-property.

## C. Conclusion

This court concludes that the BLM actions effected a regulatory taking of Fallinis' water rights at Deep Well contrary to the dictates of the constitution. The agency action, therefore, is set aside on this additional ground.

## CONCLUSION

For the aforementioned reasons, the agency action is set aside because: arbitrary and capricious, beyond the agency's statutory jurisdiction and authority, and contrary to constitutional right.

## ORDER

For the reasons stated herein, the decision of the IBLA is reversed, and the holding of the administrative law judge that "the [Fallinis] have not violated the conditions of the ... permit involved in this case nor any applicable federal regulations" is affirmed. Plaintiffs are awarded their fees and costs pursuant to 28 U.S.C. § 2412 (1977).