Joe B. FALLINI, JR.; Susan L. Fallini; Helen L. Fallini, Plaintiffs–Appellees,

v.

Donald P. HODEL, Secretary of the Interior, Robert Buford, Director of the Bureau of Land Management; Edward F. Spang, Nevada State Director, Bureau of Land Management, Defendants–Appellants.

Joe B. FALLINI, JR.; Susan L. Fallini; Helen L. Fallini, Plaintiffs–Appellees,

v.

Donald P. HODEL, Secretary of the Interior, Robert Buford, Director of the Bu-

reau of Land Management; Edward F. Spang, Nevada State Director, Bureau of Land Management, Defendants,

and

Animal Protection Institute, Defendant–Intervenor–Appellant.

Nos. 90–15124, 90–15125.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 19, 1991.

Decided May 1, 1992.

---

William B. Lazarus, U.S. Dept. of Justice, Washington, D.C., for defendants-appellants.

W. Alan Schroeder, Boise, Idaho, for plaintiffs-appellees.

Laurens H. Silver, Sierra Club Legal Defense Fund, San Francisco, Cal., for defendant-intervenor-appellant.

Before: GOODWIN and SNEED, Circuit Judges, and TAYLOR *, District Judge.

GOODWIN, Circuit Judge:

Joe, Susan, and Helen Fallini operate a cow and calf ranch on approximately 2,700 acres of deeded land in Nye County, Nevada, and hold grazing permits on 657,520 acres of public land in the Reveille Allotment of the Tonopah Resource Area. The competition between domestic cattle and free roaming wild horses for food and water on these public lands has produced folk lore, movies, legislation, and litigation.

The government appeals a judgment in favor of the Fallinis and adverse to the Bureau of Land Management, which is charged with the administration of public lands under the Taylor Grazing Act of 1934, 43 U.S.C. § 315 *et seq.* (1988) (as amended).[1] We must consider whether the Fallinis violated their federal range improvement permit when they installed highway guardrails around one of their water holes to discourage wild horses from grazing the surrounding land. Concluding that they did not, we affirm the district court.

## I. BACKGROUND

The Fallini operation, known as the Twin Springs Ranch, depends on the public lands of the Reveille Allotment for grazing during that part of the year in which natural forage is produced on the desert. The Fallini permits include the right to develop deep wells at their own expense, but they also provide that the water thus produced be made available to wildlife.

The Fallinis rotate their cattle from one area to another by closing access to one water hole and opening access to another. Virtually all of the usable water within the Allotment is artificially produced, including Deep Well, the site with which this case is concerned. The central Nevada mountains enjoy minimal rainfall and light accumulations of winter snow. The resulting moisture appears only briefly on the surface, and cattlemen since pioneer times have relied on wells in order to take advantage of the seasonal pasture within the Allotment. With the coming of rural electrification and advanced technology in the 1930s, the development of deep wells made it feasible to graze cattle in areas that had until then been the exclusive habitat of desert wildlife.

In September of 1967 the BLM, pursuant to section 4 of the Taylor Grazing Act, 43 U.S.C. § 315c, issued the Fallinis a range improvement permit, designated Deep Well, authorizing them to maintain and use a stock-watering facility on public lands inside the Allotment.[2] The permit at Deep Well—one of several issued to the Fallinis over the years authorizing improvements at the major water sources within the Al-

---

* Honorable Gary L. Taylor, United States District Judge for the Central District of California, sitting by designation.

1. The trial court's opinion is found in 725 F.Supp. 1113 (D.Nev.1989). For an earlier chapter in this conflict, see *Fallini v. Hodel,* 783 F.2d 1343, 1344 (9th Cir.1986).

2. This section of the Act provides that "[f]ences, wells, reservoirs, and other improvements necessary to the care and management of the permitted livestock may be constructed on the public lands ... under permit issued by the authority of the Secretary." 43 U.S.C. § 315c.

lotment—allows the Fallinis to make improvements so that nearby grazing lands can be available for cattle grazing.

In 1971 Congress enacted the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331–1340. At that time, according to stipulations by the parties, approximately 130 wild horses roamed within the Reveille Allotment but no wild horses or burros roamed within the vicinity of Deep Well. By 1984, however, approximately 1,800 wild horses inhabited the Allotment, and several hundred of these horses, attracted by the Fallinis' stock-watering facility, grazed the land surrounding Deep Well.

In late 1983, the Fallinis, without first obtaining BLM approval, installed highway guardrails across the entrances to nine of their water troughs within the Reveille Allotment, including Deep Well. The guardrails were erected at a height and in a manner that would prevent access to the water by wild horses; the guardrails do not bar access by cattle or indigenous wildlife.

On December 23, 1983, the BLM's manager for the Reveille Allotment issued a proposed decision stating that the installation of the guardrails constituted a modification of the watering facility and violated the Fallinis' improvement permit because BLM approval had not first been obtained as required by the applicable regulations. *See* 43 C.F.R. 4140.1(b)(2) (1982). The proposed decision required removal of the guardrails within 15 days and stated that failure to do so would result in cancellation of the Fallinis' permit. The Fallinis removed the guardrails at every water source except Deep Well and protested the BLM's proposed decision as it applied to Deep Well. On May 3, 1984, the BLM cancelled the Deep Well permit.

The Fallinis appealed the BLM's decision to an administrative law judge who found that the Fallinis "have not violated the conditions of the ... permit involved in this case nor any applicable federal regulations." The BLM appealed to the Interior Board of Land Appeals (IBLA) which reversed the administrative law judge. *See Fallini v. BLM*, 92 IBLA 200 (1986).

The Fallinis then appealed to the district court. Judge Foley made four rulings:

first, the installation of the guardrails did not require prior BLM approval; second, the BLM acted beyond its authority and jurisdiction; third, the BLM's decision was tainted by improper political influence; and fourth, the BLM's decision effected a regulatory taking of the Fallinis' water rights in violation of the Fifth Amendment. *See Fallini v. Hodel*, 725 F.Supp. 1113 (D.Nev. 1989).

## II. STANDARDS OF REVIEW

This decision, involving the application of law to facts over which the parties disagree, calls for review without deference to the trial court's application of law, but with proper respect to the trial court's determination of the facts. Fed.R.Civ.P. 52(a); *United States v. McConney*, 728 F.2d 1195, 1200–01 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

Final decisions of the IBLA are reviewed under the Administrative Procedure Act, 5 U.S.C. § 706(2). Section 706 states that the reviewing court shall

hold unlawful and set aside agency action, findings and conclusions found to be— ... (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (B) contrary to constitutional right ...; or (C) in excess of statutory jurisdiction, authority, or limitations....

*Id.* The scope of judicial review under this standard is narrow, and this court "cannot merely substitute [its] judgment for that of the IBLA." *Baker v. United States*, 613 F.2d 224, 226 (9th Cir.1980).

An agency's interpretation of the governing statute or of its own regulations is entitled to deference, but courts are the final authorities on issues of statutory and regulatory construction. *Natural Resources Defense Council, Inc. v. Hodel*, 819 F.2d 927, 929 (9th Cir.1987). The applicable standard of review is whether the agency decision "was based upon a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983).

## III. DISCUSSION

### A. *Violation of the Range Improvement Permit*

The IBLA found that the Fallinis violated permit conditions and modified their range improvement at Deep Well without first obtaining BLM approval, in violation of 43 C.F.R. § 4140.1(b)(2). That regulation provides that persons may be subject to civil and criminal penalties for "[i]nstalling, using, maintaining, modifying, and/or removing range improvements without authorization." Because the installation of guardrails was intended to and did deter wild horses from watering at Deep Well, the pivotal question was whether this alteration of the water hole gates to exclude unwanted horses was a "modification" that required prior BLM authorization. The trial court held that it was not. In reviewing the trial court's approach to the IBLA decision, two words become important: "gate" and "wildlife."

The permit for Deep Well allows the permittee to install "4 Steel gates" and requires wildlife access to water. The permit provides in relevant part that "[a]ny public lands or impounded waters will be available for wildlife use" and that the permit "is subject to cancellation for non-compliance with the rules and regulations now or hereafter approved by the Secretary of the Interior."

The Fallinis contend that their highway guardrails are gates, and both the IBLA and the trial court agreed. This may have been an unwarranted stretch of language, but it is not challenged on appeal. The permit requires the permittee to allow access to the impounded water by "wildlife." There seems to be no question but that water pumped from a deep well into a storage tank and then allowed to flow into watering troughs is "impounded." We turn then to the meaning of wildlife.

■ Ordinarily there would be little basis for quibbling about whether wild horses are wildlife. However, in a forensic range war, words can take on strange meanings. Here the trial court held that the term "wildlife" as used in the Fallinis' 1967 permit did not include feral horses. In this respect, we hold that the trial court's finding was not clearly erroneous.

Although the Fallinis' permit and its specifications were never subsequently changed, the record indicates that the Deep Well facility was changed numerous times over the years. The specified improvements were repaired, replaced, and substituted, and in some respects substantially altered. Until 1983, none of the different or additional installations was determined by the BLM to be a "modification" for which prior agency approval was required.

The IBLA concluded that the guardrails were gates and thus fell within the categories of improvements listed in the Deep Well permit. The IBLA chose to disregard definitional questions about what constituted a gate and instead focused on the purpose the gates were intended to serve. The IBLA then determined that the purpose underlying the installation of the guardrails—impeding wild horse access to the water while allowing cattle access—differed from the original purpose authorizing the installation of gates in the 1967 permit. Accordingly, the IBLA ruled that the installation of the guardrails constituted a modification requiring prior BLM approval.

Noting that an agency acts arbitrarily when it entirely fails "to consider an important aspect of the problem" before it, *see National Wildlife Fed'n v. FERC*, 801 F.2d 1505, 1512 (9th Cir.1986) (quoting *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867), the district court concluded that the IBLA failed to consider the purposes of the Taylor Grazing Act in construing the intent of the parties in 1967 and the purpose for which the Deep Well range improvement permit was issued.

The intent of the parties in drafting the permit is a question of fact. In construing the permit language, the trial court accepted the Fallinis' view that the language should mean what it meant to the parties in 1967 when the permit was issued, and not what it might mean 20 years later after Congress had dramatically changed the legal environment in which range management would occur in the future.

The 1971 wild horse legislation shortly resulted in the proliferation of feral horses in numbers that far exceeded both the

carrying capacity of the range and the imagination of the parties at the time the permits were granted. When the Fallinis' permit was issued, small scattered bands of wild horses roamed the intermountain deserts of central Nevada as well as other similar ranges in neighboring states. But wild horses were not considered "wildlife" for grazing permit purposes. It was customary for ranchers to round up redundant wild horses and ship them off for purposes that aroused the indignation and political energy of urban voters. For range permits in 1967 "wildlife" included the occasional mountain sheep, mule deer, antelope, coyote, kit fox and the birds and rodents that make up the fauna that have evolved in an almost waterless desert.

As the district court recognized, no sane rancher would spend thousands of dollars to drill a deep well and build associated water works in order to attract a population of wild horses that would eat and uproot all the grass for miles around the water hole. Before the Fallinis developed the Deep Well water facility, the few wild horses in that part of Nevada searched elsewhere for feed and water. After the laws were changed to protect the horse population, the water developed by the Fallinis attracted the recently protected and rapidly multiplying horses in numbers that made this confrontation between horses and cows on the same range inevitable.

The trial court reasoned that the BLM could not claim that a purpose of the range improvement permit was to provide water to wild horses because none had roamed the Deep Well area at the time the permit was issued. Thus, based on the permit's language and surrounding circumstances, the court concluded "that 'wildlife' does not include 'wild horses' ...." The court went on to say that the guardrails did not violate the permit conditions. *Fallini,* 725 F.Supp. at 1117. We agree.

The trial court noted that the primary purpose of the Taylor Grazing Act is "to promote the highest use of the public lands pending its final disposal." 43 U.S.C. § 315. We have stated that "the purpose of the Taylor Grazing Act is to stabilize the livestock industry and protect the rights of sheep and cattle growers from interfer-

ence." *Kidd v. United States Dep't of the Interior, Bureau of Land Management,* 756 F.2d 1410, 1411 (9th Cir.1985).

With these principles in mind, the trial court correctly turned to the original purpose of the permit in deciding that the failure to obtain prior approval before erecting the guardrails did not constitute a violation of the permit terms.

### B. *Other Issues*

The district court announced three alternative grounds for its decision. First, the court accepted the Fallinis' argument that the BLM acted beyond its authority and jurisdiction by appropriating the Deep Well water in a manner contrary to state water laws. The district court also concluded that "improper political considerations tainted the agency's exercise of its discretion." The court read the record as showing that the BLM's decision to cancel the Deep Well permit was improperly influenced by wild horse activists. The court cited no evidence, however, that the IBLA's decision was affected in any way by political pressure. As a final alternative ground for its decision, the district court held that the BLM's cancellation of the Deep Well permit constituted a regulatory taking of the Fallinis' water rights in violation of the Fifth Amendment.

Because we find adequate reasons to affirm the district court without reaching the state law, political influence, or takings issues, there is no need for us to rule on them.

### IV. CONCLUSION

The district court's factual finding regarding the intent of the parties at the time the permit was issued was not clearly erroneous. The court's application of the law to these facts was free from reversible error. Accordingly, the judgment is AFFIRMED.

TAYLOR, District Judge, dissenting:

I respectfully dissent. Rather than the majority's inquiry for the supposed intent of the *parties* (as in a contract dispute), our inquiry should be for the intent of *Congress.* Under the plain language of the

Taylor Grazing Act of 1934 and the subject permit, wild horses are "wildlife."

It is true that purposes of the Taylor Grazing Act include promoting the highest use of public lands, stabilizing the livestock industry, and protecting the rights of sheep and cattle growers. 43 U.S.C. § 315; *Kidd v. United States Dept. of the Interior,* 756 F.2d 1410, 1411 (9th Cir.1985). However, that Congressional intent must be read in harmony with the additional Congressional intent more recently expressed in the Wild Free–Roaming Horses and Burros Act. It seems apparent that, having knowledge of the earlier Act, Congress intended to allow wild horses and burros to proliferate and be treated as "wildlife" under the Taylor Grazing Act.

Nothing in the Taylor Grazing Act contemplates there be a "status quo" concerning wildlife. On the contrary, Congress anticipated future regulations to encourage *propagation* of wildlife (43 U.S.C. § 315h). Congress also provided that nothing in that Act should be construed to impair any right thereafter initiated (43 U.S.C. § 315), or impair the right to use water for a purpose which might thereafter be initiated (43 U.S.C. § 315b).

Later, in 1971, such a purpose was initiated. In the Wild Free–Roaming Horses and Burros Act, Congress acknowledged that wild free-roaming horses contribute to the diversity of life forms and are an integral part of the natural system of the public lands. 16 U.S.C. § 1331. The court should read these enactments together, and harmonize them if possible. Accordingly, I must conclude that wild horses are within the meaning of "wildlife" in the intent of Congress, the Taylor Grazing Act, and the permits granted under it.

The fact that Congress gave protected "wildlife" status to wild horses may work a hardship on the Fallinis. But this court should not try to make it right by re-defining "wildlife" to fit a supposed intent of the parties.[1] A remedy for the Fallinis may exist in the Taylor Grazing Act itself, which provides for a reduction or remittance of grazing fees if there is a range depletion due to natural causes. 43 U.S.C. § 315b.[2] However, if that is not satisfactory, any change in the law should come from Congress, and not by way of the court's re-definition of terms.

---

1. The Supreme Court faced a similar statutory analysis in *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) in deciding whether "waters" included adjacent wetlands, thereby prohibiting filling without a permit under the Federal Water Pollution Control Act: "An agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." *Id.* at 131, 106 S.Ct. at 461. Rather than analyzing the particular "intent" or hardships of the parties, the Court noted, "[O]ur review is limited to the question whether it is reasonable, in light of the language, policies, and legislative history of the Act...." *Id.* Observing that Congress chose to define the waters covered by the Act broadly, the Court deferred

to the agency's expertise, and accepted its conclusion that "waters" include adjacent wetlands. *Id.* at 133–135, 106 S.Ct. at 462–463. Similarly, in the case at bar, Congress has used the term "wildlife" broadly, and this court should not attempt to readjust that definition.

2. It may be difficult for the Fallinis to obtain compensation for any claimed "regulatory taking" because of proliferating wild horses on the permit land. By its terms, the Taylor Grazing Act specifies no compensable property right is created in the permit lands themselves as a result of permit issuance. *United States v. Fuller,* 409 U.S. 488, 494, 93 S.Ct. 801, 805, 35 L.Ed.2d 16 (1973).